396 So.2d 1122 (1981)
Ruth CHENOWETH and Donald H. Chenoweth, Her Husband, Appellants,
v.
William L. KEMP, M.D., the Good Samaritan Hospital, a Florida Corporation, and Abraham Szmukler, M.D., Appellees.
No. 56418.
Supreme Court of Florida.
April 2, 1981.
*1123 Dewey H. Varner, Jr. of Kohl, Springer, Springer & Varner, Palm Springs, for appellants.
John W. Mauro and Leonard M. Bernard of Carey, Dwyer, Cole, Selwood & Bernard, Fort Lauderdale, for William L. Kemp, M.D.
Richard A. Sherman of Wicker, Smith, Blomqvist, Davant, Tutan, O'Hara & McCoy, Miami, for The Good Samaritan Hospital.
*1124 Adams, Coogler, Watson & Smith and Larry Klein, West Palm Beach, for Dr. Abraham Szmukler.
OVERTON, Justice.
This is an appeal from a judgment for defendants-appellees in a negligence action brought against the physicians and hospital following appellant Ruth Chenoweth's hysterectomy. The medical mediation panel unanimously found no actionable negligence, and the jury verdict at trial was in favor of appellees. Before trial appellants moved the court to declare unconstitutional sections 768.45, .48, .49, .50, and .51, Florida Statutes (Supp. 1976), on the ground that as part of chapter 76-260, Laws of Florida, the above sections were void because chapter 76-260 contravened the "one subject" rule of article III, section 6, Florida Constitution. The trial court denied the motion and expressly found there was no violation of the "one subject" rule of the constitution. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. (1972).
We find that chapter 76-260 does not violate the "one subject" rule of article III, section 6, of the Florida Constitution. We have long held that the subject of an act "may be as broad as the Legislature chooses as long as the matters included in the act have a natural or logical connection." Board of Public Instruction v. Doran, 224 So.2d 693, 699 (Fla. 1969). See also State v. Lee, 356 So.2d 276 (Fla. 1978). While chapter 76-260 covers a broad range of statutory provisions dealing with medical malpractice and insurance, these provisions do relate to tort litigation and insurance reform, which have a natural or logical connection.
Appellants' second point on appeal concerns the exclusion of expert testimony under section 768.45(2), Florida Statutes (Supp. 1976). Mrs. Chenoweth suffered damage in the ulnar region of her left arm, which she claimed was due to some negligence by one or more of the appellees in the operating room or at some later point in the hospital. Appellants' concentrated their argument on the theory that Mrs. Chenoweth was incorrectly positioned and secured on the operating table, and it is to this point that appellants proffered the testimony of two neurosurgeons. Appellants wished to present the opinions of these neurosurgeons as to whether it was below the standard of care for either appellee Kemp, a specialist in obstetrics-gynecology, or appellee Szmukler, a board-certified anesthesiologist, to allow a compression injury to the ulnar nerve to occur during the course of an operation or not to use some type of padding to protect the ulnar nerve. Section 768.45(2) governs the admissibility of expert testimony on the accepted standard of care for health care providers, and paragraphs (b) and (c) provide:
(b) If the health care provider whose negligence is claimed to have created the cause of action is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who:
1. Is trained and experienced in the same specialty; and
2. Is certified by the appropriate American board in the same specialty.
(c) The purpose of this subsection is to establish a relative standard of care for various categories and classifications of health care providers. Any health care provider may testify as an expert in any action if he:
1. Is a "similar health care provider" pursuant to paragraph (a) or (b); or,
2. Is not a similar health care provider pursuant to paragraph (a) [or] (b) [but], to the satisfaction of the court, possesses sufficient training, experience, and knowledge to provide such expert testimony as to the acceptable standard of care in a given cause.
The trial court, after studying this section, refused to allow the two neurosurgeons to testify. The record is clear that the court made this determination, not upon any finding that they did not possess sufficient training, experience, or knowledge to provide *1125 such expert testimony, as allowed under paragraph (c) of section 768.45(2), but solely because they were neither specialists nor board certified in either gynecology or anesthesiology.[1] The provisions of paragraph (c) clearly require the court to make the determination that the proffered witnesses do not possess the training, experience, or knowledge to testify on the standard of care for the alleged acts in question  here the positioning of the patient on the operating table. The trial court may not always avoid this often difficult determination by resting solely on the fact that a proffered witness does not practice the same specialty as the defendants. While it is clear that the proffered witnesses would not have been competent to testify on certain acts performed by the appellees, such as the hysterectomy performed by Kemp or the anesthetizing performed by Szmukler, it is not at all clear that the two neurosurgeons were not qualified under the statute to testify concerning the positioning of the patient on the operating table and the effect of that positioning. The standard of care for this portion of the procedure may well be, as claimed by one of the neurosurgeons, the same for all surgeons relative to protection of the ulnar nerve from compression or other injury. We find the exclusion of these witnesses, under the circumstances, was error. However, we find it was harmless error, since it was not disputed that if the ulnar nerve injury was caused on the operating table, such would constitute a breach of the standard of care for both Kemp and Szmukler. Appellants' counsel even stated in his closing argument, "The doctors admitted that if you accept [the injury] as caused on the operating room table, then that would fall below the standard of care... ." (Tr. 1123). In our view, the record reflects that the jury simply did not believe that the injury was caused by the appellees' placement of the appellant-patient on the operating table.
Appellants' final three points on appeal are likewise rejected. Appellants argue that the trial court erred in admitting into evidence the actual written finding of the mediation panel, as opposed to its conclusion only, in violation of section 768.47(2), Florida Statutes (Supp. 1976). There is no basis for error in the admission of this evidence since appellants put the findings before the jury first, by reading the entire mediation panel report in their opening argument after having been denied a motion in limine. We recognize that this was a tactical decision, but appellants are bound by it.
We also disagree with appellants' assertion that it was error to admit the conclusion of the mediation panel because the panel lost jurisdiction to act. Pursuant to stipulation, the only mediation hearing held within the six-month jurisdictional period was before only one member of the panel. We need not review the decision reached in Diggett v. Conkling, 368 So.2d 74 (Fla. 4th DCA 1979), that the six-month period could not be extended by stipulation, because appellant waived his objection by not contesting the admission of the mediation finding at trial. This is not a "jurisdictional" matter which could not be waived, for while the mediation time periods are jurisdictional, the admission at trial of incompetent testimony (that is, the conclusion of the mediation panel) is not.
Finally, appellants' assertion that they were entitled to a res ipsa loquitur instruction is also without merit. This is not a case where the facts and "circumstances attendant to the injury are such that, in the light of past experience, negligence is the probable cause and the defendant is the probable actor." Goodyear Tire & Rubber Co. v. Hughes Supply, Inc., 358 So.2d 1339, *1126 1342 (Fla. 1978). See Guzman v. Faraldo, 373 So.2d 66 (Fla.3d DCA 1979), cert. denied, 383 So.2d 1195 (Fla. 1980); Anderson v. Gordon, 334 So.2d 107 (Fla. 3d DCA 1976).
The judgment is affirmed.
It is so ordered.
ADKINS, BOYD, ALDERMAN and McDONALD, JJ., concur.
SUNDBERG, C.J., dissents with an opinion, with which ENGLAND, J., concurs.
SUNDBERG, Chief Justice, dissenting.
With one ill-advised and unarticulated stroke of the judicial pen, the majority today guts the one subject requirement of the Florida Constitution. Article III, section 6 provides that "[e]very law shall embrace but one subject and matter properly connected therewith, ... ." The rationale underpinning this provision is clear:
The object of this constitutional provision, which in substance has been placed in practically all of the constitutions of the several states, was to prevent hodgepodge, logrolling, and omnibus legislation. It had become quite common for legislative bodies to embrace in the same bill incongruous matters having no relation to each other, or to the subject specified in the title, by which means measures were often adopted without attracting attention. And frequently such distinct subjects, affecting diverse interests, were combined in order to unite the members who favored either in support of all.
Colonial Inv. Co. v. Nolan, 100 Fla. 1349, 1351, 131 So. 178, 179 (1930). As previously applied, the one subject requirement kept in check the insidious leverage inherent in logrolling by ensuring that legislative acts only encompass matters having a natural relation to one another. Id.
Chapter 76-260 is a paradigm example of a law embracing more than one subject. It arguably repeals over twenty sections of the Florida Insurance Code. The law can be structurally divided into three segments, the first dealing generally with an insurance scheme for medical malpractice claims, the second entitled "Unfair Methods of Competition and Unfair and Deceptive Acts and Practices," and the third reverting back to a melange of medical malpractice provisions, from collateral sources of indemnity to additur and remittitur. The first segment includes provisions on a medical liability insurance commission, an internal risk management program, a medical incident committee, the establishment of an insurance risk apportionment plan, limitation of liability and patient's compensation fund, membership of medical mediation panels, and purchase of medical insurance. The second segment wanders expansively over the insurance field with multifarious provisions on misrepresentations and false advertising of insurance policies, defamation, coercion and intimidation in the insurance business, unfair discrimination in the classification of life insurance rates, unfair claim settlement practices, insurance transactions through credit card facilities, interlocking ownership and management of insurance companies, an insurance policyholder's "bill of rights," and life insurance relations with funeral directors. The third segment reverts back to medical malpractice claims with sections on collateral sources of indemnity, standards of recovery in malpractice actions, certification of medical experts, and standards for additur and remittitur. The chapter, rather than dealing broadly with a unified subject, is haphazardly formulated and disjointed. "A legislator in initially considering [such] a bill should not be put to the choice of accepting provisions affecting a subject matter totally alien to provisions affecting a subject matter with which he is sympathetic." State v. Lee, 356 So.2d 276, 287 (Fla. 1978) (Sundberg, J., concurring in part and dissenting in part).
This case is distinguishable from State v. Lee, where the Court took a rather permissive view of the one subject requirement of article III, section 6. The majority in Lee characterized the chapter there under attack as dealing comprehensively with "automobile insurance rates and related insurance problems." Id. at 282 (emphasis supplied). Here, chapter 76-260 ranges over *1127 almost the entire insurance field, incorporating wholly unrelated matters from medical malpractice insurance to life insurance to a policyholder's "bill of rights." Indeed, it strays from the insurance arena altogether in its inclusion of provisions on expert medical testimony and standards of tort recovery.
In the face of this legislative cyclone, the majority opinion blithely proclaims that the provisions of chapter 76-260 relate to tort litigation and insurance reform, which have a natural or logical connection. How? Why? The majority offers no explanation whatsoever for its remarkable conclusion. Can it seriously be argued that life insurance for funeral directors bears a natural connection to standards of liability in medical malpractice actions, or that the purchase of insurance through the use of credit cards is logically related to the judicial standards for additur and remittitur? I think not. If this chapter passes constitutional muster, one is hard put to envision a chapter which would not.
My disagreement with the Court's opinion runs deeper still. My colleagues hold that appellant has waived his right to contest the clearly erroneous inclusion in evidence of the actual written finding of the mediation panel because appellant first read the finding to the jury during opening argument. This ignores the fact that in the course of denying appellant's pretrial motion in limine on this subject, the trial judge specifically noted that he was going to allow the written finding to be admitted in evidence. In light of this ruling, appellant had every right, and indeed had no choice, but to comment upon the evidence in an attempt to mitigate the damage soon to be done by the erroneous inclusion of the written finding. Trial court error, not tactics, dictated appellant's actions. The majority's treatment of this issue is at best formalistic and ignores what actually occurred at trial.
For these reasons I must dissent.
ENGLAND, J., concurs.
NOTES
[1] MR. VARNER: Is it Your Honor's ruling that this particular surgeon does not have the training, experience and knowledge to provide expert testimony?

THE COURT: My ruling is that in order for him to be able to testify against these gentlemen, he should be certified.
MR. VARNER: That he has to be Board certified?
THE COURT: He has to be a specialist. I have made my ruling, whether it is right or wrong, you have a record here. Let's not pursue it any longer. (Tr. 142)