507 So.2d 1080 (1987)
Robert P. SMITH, Jr., et al., Appellants/Cross-Appellees,
v.
DEPARTMENT OF INSURANCE, et al., Appellees/Cross-Appellants.
HARTFORD FIRE INSURANCE CO., Appellant/Cross-Appellee,
v.
DEPARTMENT OF INSURANCE, et al., Appellees/Cross-Appellants.
REGENCY INSURANCE CO., et al., Appellants/Cross-Appellees,
v.
DEPARTMENT OF INSURANCE, et al., Appellees/Cross-Appellants.
Nos. 69551, 69703 and 69704.
Supreme Court of Florida.
April 23, 1987.
Rehearing Denied June 2, 1987.
*1082 Robert P. Smith, Jr., Tallahassee, in pro. per., with the Academy of Florida Trial Lawyers.
*1083 Alan C. Sundberg, Cynthia S. Tunnicliff and F. Townsend Hawkes of Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tallahassee, for The Cigna Ins. Group, et al.
Frederick B. Karl and Thomas J. Maida of Karl, McConnaughhay, Roland, Maida & Beal, P.A., Tallahassee, for American Ins. Ass'n, Nat. Ass'n of Independent Insurers, Alliance of American Insurers, et al.
Vincent J. Rio, III of Taylor, Day, Rio & Mercier, Jacksonville, for State Farm Ins. Companies.
Arthur J. England, Jr. and Charles M. Auslander of Fine, Jacobson, Schwartz, Nash, Block & England, P.A., Miami, for Hartford Fire Ins. Co.
Frederick B. Karl and Thomas J. Maida of Karl, McConnaughhay, Roland, Maida & Beal, P.A., Tallahassee, for Regency Ins. Co., et al.
Dominic M. Caparello of Messer, Vickers, Caparello, French & Madsen, Tallahassee, for American Indem. Co. and American Fire and Indem. Co.
W. Donald Cox of Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, for Nationwide Mut. Ins. Co. et al.
Brian J. Deffenbaugh and R. Terry Butler, Office of General Counsel, and David A. Yon, Daniel Y. Sumner and John E. Hale, Office of Legal Services, Dept. of Ins., and Thomas M. Ervin, Jr. and Robert King High, Jr. of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for State of Fla., Dept. of Ins., et al.
William H. Adams, III and Robert J. Winicki of Mahoney, Adams, Milam, Surface & Grimsley, Jacksonville, for Florida Medical Ass'n, Inc.
DuBose Ausley, William M. Smith and Emily S. Waugh of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for The Florida R.R. Ass'n and Florida Power & Light Co.
Edward T. O'Donnell of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, for The Product Liability Advisory Council, Inc. and The Motor Vehicle Manufacturers Ass'n of the U.S., Inc., amici curiae.
PER CURIAM.
This is an appeal from a circuit court judgment holding constitutional substantially all of chapter 86-160, Laws of Florida, known as the "Tort Reform and Insurance Act of 1986." The appellants are Robert P. Smith, Jr., with the Academy of Florida Trial Lawyers; Cigna Insurance Group, representing nine insurance companies; the American Insurance Association, National Association of Independent Insurers, and Alliance of American Insurers, representing 240 insurance companies transacting business in the State of Florida; and State Farm Insurance Companies. The appellees are the State of Florida, Department of Insurance; the Florida Medical Association, Inc., and the Florida Railroad Association, together with Florida Power and Light Company. This appeal comes directly to us under the provisions of article V, section 3(b)(5), Florida Constitution, having been certified by the First District Court of Appeal as an issue of great public importance requiring immediate resolution by this Court. We have accepted jurisdiction.
The trial court, in an extensive final judgment, held: (1) that chapter 86-160, Laws of Florida, did not violate the single subject prohibition of the constitution; (2) that the tort reform sections relating to a $450,000 cap on noneconomic damages, major modifications in joint and several liability, and other tort reform changes including relevant implementing provisions were constitutional; (3) that the insurance regulatory provisions increasing regulatory controls and freezing certain insurance rates were constitutional; and (4) that certain insurance premium rebate provisions, insofar as they retroactively apply to insurance contracts in force when the act became law, were unconstitutional. For the reasons expressed below, we affirm the judgment of the circuit court except that portion approving the $450,000 cap on noneconomic damages which we find unconstitutional.
The 1986 Tort Reform and Insurance Act is the legislative solution to a commercial *1084 insurance liability crisis which the legislature found existed.[1] For various reasons, both the insurance industry and the trial lawyers' bar challenge the act's constitutionality. The legislature, to ensure that the public and reviewing courts fully understood the reasons and purpose for enacting this legislation, set forth, in the preamble of the act, detailed legislative findings, including the following: (1) "that there is in Florida a financial crisis in the liability insurance industry, causing a serious lack of availability of many lines of commercial liability insurance"; (2) "that professionals, businesses, and governmental entities are faced with dramatic increases in the cost of insurance coverage"; (3) "the absence of insurance is seriously adverse to many sectors of Florida's economy"; (4) "that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their noneconomic losses."[2]
The multiple challenges to this act will be discussed in three parts: Part I, The Single Subject Requirement; Part II, Tort Reforms; and Part III, Insurance Regulatory Changes.

Part I. Single Subject Requirement
All the appellants, both the trial lawyers and the insurance companies, contend that chapter 86-160 violates article III, section 6, of the Florida Constitution because it contains multiple subjects. That section of the Florida Constitution provides: *1085 "Every law shall embrace but one subject and matter properly connected therewith... ." We have addressed and rejected single subject challenges to similar legislative acts in State v. Lee, 356 So.2d 276 (Fla. 1978), and Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981).
In Lee, the subject legislation was chapter 77-468, a comprehensive auto insurance and tort reform statute. We explained the act as a legislative attempt to "deal comprehensively with tort claims and particularly with the problem of a substantial increase in automobile insurance rates and related insurance problems." 356 So.2d at 282. Appellees argued that the statute contained "at least two separate subjects, insurance and tort reform." Id. We explained the reasoning behind the constitutional restriction:
The purpose of the constitutional prohibition against a plurality of subjects in a single legislative act is to prevent a single enactment from becoming a "cloak" for dissimilar legislation having no necessary or appropriate connection with the subject matter.
Id. (citation omitted). We found no single subject violation in Lee and said: "Given the profound effect of tort litigation on all phases of the automobile insurance industry, we cannot say that tort law and automobile insurance have no logical connection." Id.
In Chenoweth, appellants contended that chapter 76-260 was unconstitutional because the chapter contained malpractice tort reform and insurance reform in one act. We held that medical malpractice and insurance relate to tort litigation and insurance reform and that they have a natural or logical connection. We reiterated that "the subject of an act `may be as broad as the Legislature chooses as long as the matters included in the act have a natural or logical connection.'" 396 So.2d at 1124 (quoting from Board of Public Instruction v. Doran, 224 So.2d 693, 699 (Fla. 1969)).
Further, in Fine v. Firestone, 448 So.2d 984 (Fla. 1984), we distinguished between the single subject requirement contained in article XI, section 3, for constitutional initiative petitions and the single subject requirement for legislative acts contained in article III, section 6. In regard to legislative acts, we stated, "[W]e have taken a broad view of this legislative restriction," id. at 988 (emphasis added), and explained why the two constitutional provisions should be distinguished, stating:
First, we find that the language "shall embrace but one subject and matter properly connected therewith" in article III, section 6, regarding statutory change by the legislature is broader than the language "shall embrace but one subject and matter directly connected therewith," in article XI, section 3, regarding constitutional change by initiative.
Id. at 988-989. We also stated that we should take a broader view of the legislative provision because in that process there was an opportunity for legislative debate and public hearing which was not available under the initiative scheme for constitutional revision, and, also, that we should require strict compliance with the single subject rule for initiative constitutional change because our constitution is the basic document that controls our governmental functions.
In the instant case, appellants claim that chapter 86-160 goes further than the statutes upheld in Lee and Chenoweth. Appellants argue that our decisions in those two cases mark the outer limits of permissible subject matter inclusion if the single subject requirement is to remain a viable restriction. Appellants also take the position that chapter 86-160 contains not only insurance regulation and tort reform, but also broad reforms in the civil damage litigation area. We disagree.
Chapter 86-160 is extensive, but can easily be divided into five basic areas. We use the words of the trial judge to summarize the five parts of the act. The first part contains long-term insurance reform which "(a) expands the authority of the Department of Insurance to review and approve property and casualty rates; (b) establishes a joint underwriting association to guarantee the availability of property and casualty insurance to persons required by law to *1086 have insurance, but who have been rejected in the voluntary market; (c) creates an excess profits law for commercial property and casualty insurance; (d) requires insurance companies to return excess profits to policyholders who comply with risk management guidelines; (e) restricts cancellations and non-renewals of casualty insurance contracts; (f) allows the formation of professional and commercial self-insurance funds; and (g) permits banks to own and control reinsurance companies."
The second part contains the tort reforms which "(a) largely replace joint and several liability with proportional liability; (b) limit noneconomic damages to $450,000; (c) require structuring of future economic damages exceeding $250,000; (d) require damages to be itemized in verdicts; (e) require courts to reduce judgments by amounts contributed from collateral sources; (f) create an offer of judgment/demand for judgment rule; (g) authorize judges to require settlement conferences; (h) specify criteria by which judges can increase or decrease jury verdicts by additur or remittitur; and (i) place limits on punitive damages."
The third part of the act contains temporary insurance reform which "rolls back commercial liability insurance premiums and freezes increases in liability insurance rates until January 1, 1987."
The fourth part of the act "creates a five-member task force to study tort [reform] and insurance law to determine the effects of the bill and other issues linked to reducing the costs of insurance, self-insurance and the tort liability system."
Finally, the fifth part of the act "modifies financial responsibility requirements applicable to physicians."
In upholding the constitutionality of this act against a single subject attack, the trial judge stated that "over the years, the tort system as we now know it and liability insurance have grown together, the former having influenced and molded the nature of the latter. The availability of liability insurance has liberalized the law of torts, as well. Legal scholars have long commented on the relationship between the two." See W. Keeton & W. Prosser, Prosser and Keeton on Torts at 584 (5th ed. 1984); Priest, In the Invention of Enterprise Liability: A Critical History of the Intellectual Foundation of Modern Tort Law, 14 J. Legal Stud. 461 (1985).
The legislature explained in the preamble of the act how tort reform provisions and the insurance regulatory provisions are "properly connected" by stating:
[T]here is ... a serious lack of availability of many lines of commercial liability insurance, and . .. if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their noneconomic losses, and ... the current tort system has significantly contributed to the insurance availability and affordability crisis... .
The Florida Legislature, in enacting chapter 86-160, was responding to public pressure brought about by a liability insurance crisis. Claims were presented that businesses were closing, physicians were severely limiting their practice in certain areas of medicine, and public entities were reducing public services, all resulting from the unavailability or increased cost of liability insurance. A recent law review article[3] identified some of the stories presented to the legislature[4] and summarized them as *1087 "representations of enormous increases in the cost of doing business from virtually every kind of business in the state, representations by the insurance industry that its costs had spiraled out of control, and demands from consumer activists and the trial bar for increased insurance regulation."[5]
The test to determine whether legislation meets the single-subject requirement is based on common sense. It requires examining the act to determine if the provisions "are fairly and naturally germane to the subject of the act, or are such as are necessary incidents to or tend to make effective or promote the objects and purposes of legislation included in the subject." State v. Canova, 94 So.2d 181, 184 (Fla. 1957) (citation omitted). We reject appellants' contention that by including contract actions where damages are sought, the legislature impermissibly broadened the subject matter and violated the single subject requirement. We interpret this act as applying only to claims for personal injury and property damage, both tort and contract. Many such claims are brought under both a tort theory and a contract theory, e.g., breach of warranty and strict liability, and commercial liability insurance coverage applies to both. Each of the challenged sections is an integral part of the statutory scheme enacted by the legislature to address one primary goal: the availability of affordable liability insurance. We conclude by approving the words of the trial judge that the legislature was attempting to meet "the single goal of creating a stable market for liability insurance in this state." Civil litigation does have an effect on insurance and there is no reasonable way that we can say they are not properly connected. We hold chapter 86-160 does not violate the single subject requirement.

Part II. Tort Reform
Appellants Smith and the Academy of Trial Lawyers raise three basic challenges to the constitutionality of the tort reform provisions of the act. First, appellants contend that section 59, limiting noneconomic damages to $450,000 unconstitutionally denies claimants access to the courts, violates article I, section 21, of the Florida Constitution and the equal protection clauses of the Florida and United States Constitutions. Second, on the same grounds, appellants claim that section 60, modifying joint and several liability, is unconstitutional. Third, they argue that the seven sections of the act relating to other tort reform revisions [sections 51-54 and 56-58] are unconstitutional because they violate the separation of powers requirement of article II, section 3, of the Florida Constitution.

Limitation on Noneconomic Damages in the Amount of $450,000
Section 59 places a $450,000 limitation on damages for noneconomic losses, defined as damages "to compensate for pain and suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of capacity for enjoyment of life, and other nonpecuniary damages." Smith and the Academy argue that the cap on noneconomic damages is contrary to article I, section 21 of the Florida Constitution:
The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.
It is uncontroverted that there currently exists a right to sue on and recover noneconomic damages of any amount and that this right existed at the time the current Florida Constitution was adopted. The right to redress of any injury does not draw any distinction between economic and noneconomic damages nor does article I, section 21 contain any language which would support the proposition that the right is limited, or may be limited, to suits above or below any given figure.
The parties agree that the seminal case on the right of access to the courts is Kluger v. White, 281 So.2d 1 (Fla. 1973). *1088 They disagree, however, as to its application. In Kluger, we addressed the question of whether the legislature could restrict the right by establishing a minimum threshold of $550 for economic damages below which the injured plaintiff would have no right to sue. Our answer was no and our holding there is directly controlling here.
[W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.
Id. at 4. There is no relevant distinction between the issue in Kluger and the issue here. In Kluger, the legislature attempted to unconstitutionally restrict the right of redress at the bottom of the damages spectrum; here, it attempts to restrict the top of the spectrum. Neither restriction is permissible unless one of the Kluger exceptions is met; i.e., (1) providing a reasonable alternative remedy or commensurate benefit, or (2) legislative showing of overpowering public necessity for the abolishment of the right and no alternative method of meeting such public necessity.
Appellees urge that Kluger is distinguishable in light of Lasky v. State Farm Insurance Co., 296 So.2d 9 (Fla. 1974), and Chapman v. Dillon, 415 So.2d 12 (Fla. 1982). In Lasky, we upheld a statutory provision which denied recovery for pain and suffering and similar intangible items of damages unless the plaintiff was able to meet a $1,000 medical expense threshold. We did so, however, because the legislature had provided such plaintiffs with an alternative remedy and a commensurate benefit. First, the vehicular no-fault insurance statute required that all motor vehicle owners obtain insurance or other security to provide injured persons with minimum benefits. This was essentially a contractual arrangement; if the defendant vehicle owner failed to purchase the required insurance, the defendant's immunity was nullified and the plaintiff retained the right to sue below the threshold. Second, under the no-fault insurance statute, any given vehicle owner was as likely to be sued as to sue and giving up the right to sue was compensated for by obtaining the right not to be sued. Thus, unlike here, the legislation we upheld in Lasky provided a reasonable trade off of the right to sue for the right to recover uncontested benefits under the statutory no-fault insurance scheme and the right not to be sued. Here, the benefits of a $450,000 cap on noneconomic damages run in only one direction because the potential plaintiffs and defendants stand on different footing. For example, a medical patient or the client of a lawyer obtains no compensatory benefit from a cap placed on noneconomic damages because of the unlikeliness of negligence by a patient or client.[6]
Appellees also argue, and the trial court below agreed, that the legislature has not totally abolished a cause of action, it has only placed a cap on damages which may be recovered and, therefore, has not denied the right to access the courts. This reasoning focuses on the title to article I, section 21, "Access to courts," and overlooks the contents which must be read in conjunction with section 22, "Trial by jury." Access to courts is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery at $450,000. Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the *1089 constitutional benefit of a jury trial as we have heretofore understood that right. Further, if the legislature may constitutionally cap recovery at $450,000, there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000, or $1,000, or even $1. None of these caps, under the reasoning of appellees, would "totally" abolish the right of access to the courts. At least one of the appellees candidly argues that there is no constitutional bar to completely abolishing noneconomic damages by requiring potential injured victims to buy insurance protecting themselves against economic loss due to injury as an alternative remedy. That particular issue is not before us but we note that if it were permissible to restrict the constitutional right by legislative action, without meeting the conditions set forth in Kluger, the constitutional right of access to the courts for redress of injuries would be subordinated to, and a creature of, legislative grace or, as Mr. Smith puts it, "majoritarian whim." There are political systems where constitutional rights are subordinated to the power of the executive or legislative branches, but ours is not such a system
Justice Overton appears to believe that the legislature's major purpose in capping noneconomic damages was to assure available and affordable insurance coverage for all citizens and that this furnishes a rational basis for the cap. This reasoning fails to recognize that we are dealing with a constitutional right which may not be restricted simply because the legislature deems it rational to do so. Rationality only becomes relevant if the legislature provides an alternative remedy or abrogates or restricts the right based on a showing of overpowering public necessity and that no alternative method of meeting that necessity exists. Here, however, the legislature has provided nothing in the way of an alternative remedy or commensurate benefit and one can only speculate, in an act of faith, that somehow the legislative scheme will benefit the tort victim. We cannot embrace such nebulous reasoning when a constitutional right is involved. Further, the trial judge below did not rely on  nor have appellees urged before this Court  that the cap is based on a legislative showing of "an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown." Kluger, 281 So.2d at 4.
Appellees also rely on cases upholding the statutory caps in section 768.28, Florida Statutes (1973), on tort damages against the state and its subdivisions. Jetton v. Jacksonville Electric Authority, 399 So.2d 396 (Fla. 1st DCA), rev. denied, 411 So.2d 383 (Fla. 1981). This argument fails to recognize that section 768.28 waived sovereign immunity and its primary effect was to permit suits which had previously been prohibited. The right of the legislature to waive sovereign immunity and to place conditions on the waiver is plenary under article X, section 13, Florida Constitution. For those rights of action which existed prior to section 768.28, Cauley v. City of Jacksonville, 403 So.2d 379 (Fla. 1981), implicitly recognizes that Kluger would be applicable. Moreover, in Cauley, we made a point of noting Jetton and distancing ourselves from the reasoning on which appellees rely.
The question remains whether section 59, which we hold to be unconstitutional, may be severed from the statute. We conclude that it may. In resolving the issue of severability, this Court has consistently applied the tests set forth in Cramp v. Board of Public Instruction of Orange County, 137 So.2d 828 (Fla. 1962):
When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.
*1090 Id. at 830; see, e.g., State v. Lee, 356 So.2d 276, 283 (Fla. 1978). In applying Cramp, we note, first, that the legislature specifically stated that any provision of the act found to be invalid should be severed from the remaining sections of the act. Moreover, the sense of crisis and the need to meet that crisis expressed by the legislative preamble suggest that we should sever section 59 if need be. To declare the entire act unconstitutional would undo much of the work already accomplished and return the state to the condition which the legislature found unacceptable. We answer question one in the affirmative. We also answer questions two and four in the affirmative. The portions of the statute which remain are viable and complete. We see no reason why the absence of section 59 should prevent the remaining portions of the act from having the ameliorative effect which the legislature sought and stated in the preamble to the act. As to question three, we conclude also, from an objective viewpoint, that there is a strong likelihood that the legislature would have passed the act without the inclusion of section 59. This conclusion is supported by the severance clause in the act. The legislature was faced with what it considered to be an insurance crisis. Subjectively, it may be that there was major political opposition to the act. Indeed, of the various parties that appear before us on both sides of the issue, only the Department of Insurance supports the act without reservation. We are not, however, competent or authorized to base our decision on our analysis of the subjective political views of the individual members of the legislature or the pressure groups which lobby the legislature. Even if we assume that the cap of $450,000 is of importance to the insurance industry and its clients, the fact remains that the remaining portions of the act[7] enable the industry to obtain insurance premium rates commensurate with the risk inherent in uncapped damages for noneconomic injuries. We hold that section 59 is severable from the remaining portions of the act.

Joint and Several Liability
Appellants Smith and the Academy of Trial Lawyers also challenge section 60, which modifies the doctrine of joint and several liability, on denial of access, due process, and equal protection grounds. We disagree and hold this provision constitutional. Section 60 modifies the doctrine by abrogating joint and several liability, stating: "[T]he court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability." However, section 60 establishes three categories of exceptions that significantly modify this abrogation: (1) joint and several liability shall still apply for economic damages "with respect to any party [defendant] whose percentage of fault equals or exceeds that of a particular claimant"; (2) joint and several liability shall still apply "to any action brought by any person to recover actual economic damages resulting from pollution, to any action based upon an intentional tort, or to any cause of action as to which application of the doctrine of joint and several liability is specifically provided by chapter 403 [pollution control], chapter 498 [land sale practices], chapter 517 [security transactions], chapter 542 [anti-trust], or chapter 895 [the RICO act]"; and (3) joint and several liability shall still apply "to all actions in which the total amount of damages does not exceed $25,000." This modification is similar to modifications in other jurisdictions, including Indiana, Louisiana, Nevada, Oregon, Pennsylvania, and Texas. Further, in thirty-five jurisdictions, a plaintiff is unable to recover unless the defendant's negligence is greater than the plaintiff's.[8]
Joint and several liability and contributory negligence evolved together. The contributory negligence doctrine, which evolved from an 1809 English case,[9] is described as an "all or nothing rule" for the plaintiff. We adopted that doctrine by our decision in Louisville and Nashville Railroad *1091 Co. v. Yniestra, 21 Fla. 700 (Fla. 1886), and it remained in force until our landmark decision in Hoffman v. Jones, 280 So.2d 431 (Fla. 1973), in which we became the first state to judicially adopt comparative negligence. In that decision, we stated:
The rule of contributory negligence as a complete bar to recovery was imported into the law by judges. Whatever may have been the historical justification for it, today it is almost universally regarded as unjust and inequitable to vest an entire accidental loss on one of the parties whose negligent conduct combined with the negligence of the other party to produce the loss. If fault is to remain the test of liability, then the doctrine of comparative negligence which involves apportionment of the loss among those whose fault contributed to the occurrence is more consistent with liability based on a fault premise.
Id. at 436.
Originally, joint and several liability applied when the defendants acted in concert, the act of one being considered the act of all, and each was therefore liable for the entire loss sustained by the plaintiff. The doctrine was later expanded by eliminating the requirement that the parties act in concert and allowing joint and several liability to apply when separate independent acts of negligence combined to produce a single injury. See Louisville and Nashville Railroad Co. v. Allen, 67 Fla. 257, 65 So. 8 (1914). The doctrine was based on the assumption that injuries were indivisible and there was no means available to apportion fault.
The asserted justification for legislative modification of joint and several liability is that the underlying basis for the doctrine no longer exists. It is contended that requiring one tortfeasor to pay one hundred percent of the damages may have been valid under contributory negligence because the legal principles of that doctrine deemed the injuries indivisible and there was no way to determine each tortfeasor's degree of negligence or fault, but it should not apply under pure comparative negligence principles. Further, it is argued that, in accordance with the philosophy of Hoffman, the principles of fairness require the elimination of joint and several liability by making each party's liability dependent upon his degree of fault  not on the solvency of his codefendants  and that fairness requires at least a modification of joint and several liability in order to balance the system. In response, it is argued that, given a choice between requiring an innocent plaintiff to incur the loss or requiring a defendant to pay more than his proportionate share, the choice should be the defendant because he is better able to spread the loss among all consumers by the insurance conduit.
The real question in the joint and several liability problem is who should pay the damages caused by an insolvent tortfeasor. The problem is substantially compounded when the plaintiff is also at fault. In addressing this difficult issue, the legislature chose not to abolish joint and several liability in its entirety. Instead, the doctrine was modified by this act and continues to exist as to economic damages when a defendant's negligence is equal to or exceeds the plaintiff's. In this circumstance, each defendant is liable for only his own percentage share of noneconomic damages.
The legislature did not abrogate joint and several liability in the areas of intentional torts and those acts that violate state statutory provisions. In addition, it found no need to abrogate the doctrine in cases under $25,000. In answering the question of who should pay damages for the insolvent tortfeasor, the legislature chose a middle ground: both the plaintiff and the solvent defendant.
We find no due process or equal protection violation because there is a rational basis for each exception. We find no violation of the right of access to the court because that right does not include the right to recover for injuries beyond those caused by the particular defendant. Finally, this section does not deny persons rights because of physical handicap.

*1092 Judicial Encroachment

Appellants Smith and the Academy next contend that sections 51 and 52 [punitive damages], section 53 [remittitur and additur], section 54 [an optional provision for settlement conferences], section 56 [requiring an itemized verdict for economic, noneconomic, and punitive damages], section 57 [providing alternative methods for payment of future economic damages], and section 58 [attorney's fees], each violate the separation of powers provision of article II, section 3, of the Florida Constitution. We agree with the trial judge's rejection of this argument and approve his explanation.[10]
When the legislature enacted these provisions, it was addressing the substantive rights of plaintiffs and defendants in civil litigation actions with regard to recovery of damages. Although section 56 in particular has certain procedural aspects that will require immediate examination by this Court, its provisions are necessary to implement the substantive provisions of sections 51, 52, and 60. We find that all these sections are directly related to the substantive statutory scheme and conclude that these provisions do not violate the separation of powers clause of the Florida Constitution.

Part III. The Insurance Regulatory Challenges
The insurance regulatory provisions of chapter 86-160 have long-term and short-term effect. The challenged long-term regulatory reform provisions are sections 9, 10, 13, and 44. The challenged short-term provisions are contained in section 66.

Challenge to Section 9
Appellants American Insurance Association, et al., challenge the section 9 provisions imposing stricter regulatory requirements on commercial insurance lines. This type of regulatory scheme requires *1093 the Department of Insurance to review rate filings, including premium credits and surcharges, and disapprove excessive, inadequate, or unfairly discriminatory rates. It requires insurers to actuarially justify proposed rates. In recent years, these commercial insurance lines have been reviewed and regulated under the "open competition" rating law. The new regulatory provisions are almost identical to the regulatory laws applicable to private passenger motor vehicles and worker's compensation, which we have approved. See, e.g., Florida Welding & Erection Service, Inc. v. American Mutual Insurance Co., 285 So.2d 386 (Fla. 1973); Williams v. Hartford Accident and Indemnity Co., 245 So.2d 64 (Fla. 1970); cf. Nationwide Mutual Insurance Co. v. Williams, 188 So.2d 368 (Fla. 1st DCA 1966). We reject the argument that section 9 violates equal protection and due process because it is too broad and addresses lines of insurance for which a crisis does not presently exist. We find a legitimate state interest in regulating these insurance rates, and hold these insurance companies have no constitutional right to be regulated and governed by this specific type of "open competition" law. In fact, those lines of insurance were regulated by a similar pre-file format prior to the adoption of the "open competition" scheme. We further reject the claim that this section unconstitutionally delegates legislative authority.

Challenge to Section 10
The appellants American Insurance Association, et al., and the appellant Cigna Insurance Group challenge the excess profits provision of section 10 as an improper use of the police power and a denial of equal protection to certain policy-holders. Appellants claim that section 10 arbitrarily divides insurers into "good" and "better" insurers, and thereby denies equal protection to the former group. Appellants also argue that State v. Lee, 356 So.2d 276 (Fla. 1978), controls. We disagree. In Lee, we held that the state could not constitutionally use the police power to impose increased fines on drivers convicted of traffic violations and place those increased fines in a fund to be distributed to the "good drivers." We found the provision unconstitutional because "(i) it improperly uses the police power to take private property from one group of individuals solely for the benefit of another limited class of individuals; and (ii) it violates the Equal Protection Clause of the United States and Florida Constitutions in that it constitutes an irrational classification." Id. at 278. The statute in Lee is clearly distinguishable from the excess profits provision in the instant case. First and foremost, the excess profits law does not impose any fine or civil penalty. Next, it does not take property from one group and give it to another limited group. The excess profits contemplated by section 10 result from unanticipated windfalls which would benefit the insurance companies. Section 10 informs the insurance companies that they are not entitled to retain the excess profits, because the excess profits belong to those policyholders whose favorable loss experience created the unexpected gain. We have previously held that this type of excess profit law is rationally related to a legitimate state interest because it protects policyholders from exorbitantly high insurance rates. Further, the refund mechanism in section 10 is almost identical to that approved for passenger motor vehicle insurance. See United States Fidelity and Guaranty Co. v. Department of Insurance, 453 So.2d 1355 (Fla. 1984), and Department of Insurance v. Teachers Insurance Co., 404 So.2d 735 (Fla. 1981). See also John Deere Insurance Co. v. State, Department of Insurance, 463 So.2d 385 (Fla. 1st DCA 1985). We find that section 10 does not violate due process or equal protection.

Challenge to Section 13
Appellant Cigna Insurance Group challenges section 13 for granting the Department of Insurance the authority to establish joint underwriting associations when "any class, line, or type of coverage of property or casualty insurance is not available at adequate levels from insurers." The act defines "adequate level of coverage" *1094 to mean "that coverage which is required by state law or by responsible or prudent business practices." Cigna claims the latter phrase gives the Department too much discretion. The trial judge rejected this contention and stated: "Applying the rule of reason, it should be no confusing task for the Department to identify risks that prudence and responsibility suggest should be insured against in making a reasoned judgment about the availability of insurance and whether or not to create a joint underwriting association in a particular line of insurance coverage." We agree. In our view, the statutory guideline is sufficiently precise and consistent with legislative standards which we upheld in other cases concerning insurance regulation. See, e.g., United States Fidelity and Guaranty Co. v. Department of Insurance, 453 So.2d 1355 (Fla. 1984); Department of Insurance v. Southeast Volusia Hospital District, 438 So.2d 815 (Fla. 1983); Florida Welding & Erection Service, Inc. v. American Mutual Insurance Co., 285 So.2d 386 (Fla. 1973).

Challenge to Section 44
Section 44 expands the Florida Medical Malpractice Joint Underwriting Association's capability to address the medical malpractice coverage problem by (1) providing "tail" coverage to insureds whose "claims made" coverage with another insurer has or will be terminated; and (2) directing that the association provide "assessment insurance" to physicians who had purchased insurance from the Florida Patient's Compensation Fund, and thereby correct a seven-day hiatus in their coverage caused unintentionally by an earlier effective date of the act which repealed the provisions in chapter 82-391, Laws of Florida. State Farm expressly challenges this section on due process grounds and on the ground that it violates the eminent domain clause of the Florida Constitution by giving physicians a subsidy for losses which have already occurred. The record did not reveal that any losses had in fact occurred. Further, the Department of Insurance has responded that an insurer who participates in the Florida Medical Malpractice Joint Underwriting Association could be held responsible for losses only if the premium collected, plus additional assessments from the policyholders, is insufficient to pay the losses. We agree with the trial court that there has not been a taking in this circumstance and this corrective legislation does not violate the due process clause of the state or federal constitution.

Challenge to Section 66
Section 66 contains almost all the temporary insurance reforms. These provisions are intended to provide immediate relief and protection for insurance policyholders. The legislature received evidence that savings from the tort reform provisions would reduce policy costs by at least ten percent. Section 66 is intended to grant the policyholders the benefit of these reforms. They include, in section 66(1-3), credits and refunds on existing policies; in section 66(4), a rate freeze providing immediate temporary relief until December 31, 1986, from rate increases; in section 66(5-6), a requirement that each insurer make a filing by October 1, 1986, of rates that were in effect on January 1, 1984, adjusted for changes in coverage, investment income, and allowing a higher rate if actuarially justified; and, in section 66(7), and section 4 and 16, provisions which prohibit mass cancellations or renewals by an insurer for the purpose of avoiding the rate freeze or premium refund provisions of the act.
The first challenged provisions, section 66(1-3), require all commercial liability policies in effect in Florida from October 1, 1986, to December 31, 1986, no matter when the policy was written, to provide a special credit or premium rebate because of the anticipated benefits of the tort reform provisions. The trial court's chief concern was the constitutionality of this provision for contracts written before July 1, 1986, the act's effective date. The ultimate question is whether the legislature had sufficient authority under these circumstances to impair existing insurance contracts by changing the agreed-to premiums. The trial court, after considering Pomponio v. Claridge of Pompano Condominium, *1095 Inc., 378 So.2d 774 (Fla. 1979), and United States Fidelity and Guaranty Co. v. Department of Insurance, 453 So.2d 1355 (Fla. 1984), concluded that they did not. We agree with the trial court's application of Pomponio and reject the Department of Insurance argument that, under the circumstances of this act, the legislature could properly impair these contracts. We also agree with the trial court that this section is severable from the act as a whole.
We also agree with the trial court that the remaining provisions of section 66 are constitutional. These provisions were clearly intended to ensure that the policyholders and the insurance companies would equally benefit from the tort reforms. The provisions of the act clearly allow the insurance companies an opportunity to present to the Department of Insurance all rate-making factors to determine an insurance rate that will provide each of them a reasonable rate of return on their Florida business.
Further, we emphasize that the act provides that if any tort reform measure is held unconstitutional, the Department of Insurance shall permit an adjustment of rates to reflect the impact of such holding. See section 66(6). We construe this to include an adjustment to the special credit provided in section 66(1-3). Since the transitional provisions contained in section 66, which have been stayed pending this suit, were predicated in part upon the anticipated savings to insurance companies resulting from the cap on noneconomic damages, in now implementing these provisions the department is directed to take into consideration the elimination of the cap.
Stays were entered in this cause to prohibit the implementation of the temporary provisions pending resolution of the case. To assure fair administrative implementation of section 66, all parties should submit to the Court proposed dates for compliance with the act.

Conclusion
The legislature was presented with the public concern that commercial liability insurance had become too expensive and, in some instances, unavailable. The legislature determined that a major problem existed and determined that, if a solution was not found, claimants would be unduly restricted in their recovery of damages because there would be only limited insurance available to spread the risk of loss.
Chapter 86-160 is the legislature's solution. Whether this is the best solution, or whether it will work, is not for this Court to determine. We do find that the legislature had a rational basis for its action, and that its work product, with the exception of section 59 and one portion of section 66, is entirely within constitutional parameters.
For the reasons expressed, we affirm the trial court's judgment, except we hold unconstitutional the $450,000 cap on noneconomic damages in section 59 and that portion of section 66 pertaining to insurance contracts written before July 1, 1986.
It has been suggested that the dates of compliance with the remaining provisions of sections 66 be modified as agreed to by the Department of Insurance and the insurance companies that are parties to this action. This modification is necessary because of prior stays to the implementation of this section granted in this proceeding. A separate order approving this agreement between the insurance companies and the Department of Insurance is being contemporaneously entered by this court.
It is so ordered.
SHAW, GRIMES and KOGAN, JJ., concur.
OVERTON, Acting C.J., concurs specially with an opinion, in which GRIMES, J., concurs.
ERHLICH, J., concurs in part and dissents in part with an opinion, in which BARKETT, J. and ADKINS, J. (Ret.), concur.
ADKINS, J. (Ret.), concurs in part and dissents in part with an opinion.
*1096 OVERTON, Acting Chief Justice, specially concurring.
I would go further and uphold section 59 limiting noneconomic damages to $450,000. The majority opinion holds that the record fails to establish that this cap is an essential ingredient of the legislative scheme to assure available and affordable insurance coverage and, therefore, fails to meet the test in Kluger v. White, 281 So.2d 1 (Fla. 1973).
It appears to me the record can also be read to conclude that the $450,000 limitation on damages for noneconomic losses was an important factor in assuring that more tortfeasors will be covered by insurance and thereby allow more victims a source of recovery. Without question, making sure that insurance will be available for injured persons to recover damages for economic and noneconomic losses is clearly a justifiable legislative purpose. Most individuals and ordinary businesses cannot respond to a $450,000 judgment without insurance coverage and the access-to-the-court requirement has no meaning whatever if there is no ability to collect a judgment. It is collecting a judgment  not filing a lawsuit  that counts.
GRIMES, J., concurs.
EHRLICH, Justice, concurring in part, dissenting in part.
I concur in parts two and three of the majority opinion but dissent as to part one.
I concur in the Court's reasoning in holding that section 59 is unconstitutional because it violates article I, section 21. While I appreciate the Court's resolve in refusing to succumb to "nebulous reasoning when a constitutional right is involved" which would erode that constitutional right, in my view the Court has unfortunately failed to heed its own counsel and has indeed succumbed to nebulous reasoning in finding that 86-160 does not violate the single subject requirement of article III, section 6. Because 86-160 clearly violates the single subject requirement of our constitution, this basic infirmity renders the entire act unconstitutional.
The majority correctly notes that we rejected single subject challenges in two fairly recent cases, Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981), and State v. Lee, 356 So.2d 276 (Fla. 1978). I candidly admit that this Court's recent treatment of article III, section 6 quite possibly led the legislature to believe that 86-160 would not violate the single subject requirement. The principle of stare decisis is, of course, critical for our legal system, promoting as it does stability and uniformity in the law. However, it is not an absolute and we must on occasion discard prior decisions when, for example, traditional legal principles fail to do justice in light of modern reality. In these situations, the judiciary of necessity must move cautiously and not discard in a cavalier fashion prior decisions and thereby disrupt the expectations and legal relationships upon which society had previously relied. There are other occasions when a court should "bite the bullet," such as in the case of an earlier erroneous judicial decision. In this situation the only legally correct and ethically honorable solution is for the Court to admit its error and proceed to rectify it. Perpetuating an error in legal thinking under the guise of stare decisis serves no one well and only undermines the integrity and credibility of the Court. This is true whether the prior decision dealt with a common law rule, a question of statutory construction or an issue of constitutional interpretation. When a prior decision from this Court interprets the Florida Constitution erroneously, the gravity of the error takes on a new and more far reaching dimension because it is this Court's unique and ultimate responsibility to interpret our organic law in such a way as to render it meaningful and to give effect to the intentions of its framers. Because Kemp and Lee were erroneously decided, they should be expressly overruled. Those two decisions, and the majority opinion herein, have written article III, section 6 out of the Florida Constitution, leaving only those whose avocation is to debate academic conundrums to speculate on what possible meaning this constitutional provision now has.
*1097 I fully accept that when faced with constitutional challenges, courts should indulge in every reasonable interpretation of the statute in order to uphold it. However, a statute must have been enacted in a constitutional manner for this principle to be relevant. A constitutional provision must be interpreted so as to render it meaningful and the interpretation must be made in light of the reason the provision was originally placed in that document.
A simple survey of this Court's earlier decisions fully explains the reason for article III, section 6:
The object of this constitutional provision, which in substance has been placed in practically all of the constitutions of the several states, was to prevent hodge-podge, log-rolling, and omnibus legislation. It had become quite common for legislative bodies to embrace in the same bill incongruous matters having no relation to each other, or to the subject specified in the title, by which means measures were often adopted without attracting attention. And frequently such distinct subjects, affecting diverse interests, were combined in order to unite the members who favored either in support of all.
Colonial Inv. Co. v. Nolan, 100 Fla. 1349, 1351, 131 So. 178, 179 (1930). See also Lee v. Bigby, 136 Fla. 305, 186 So. 505 (1939) (provision was designed to prevent surprise, hodgepodge and logrolling in legislation). The single subject provision has been considered to be mandatory by this Court, Boyer v. Black, 154 Fla. 723, 726, 18 So.2d 886, 887 (1944), and when the body of the act embraces more than one subject, it must be declared unconstitutional. Nolan.
In my view the Court lost its historical understanding of the meaning of article III, section 6 in Kemp and Lee because it confused the subject of the act with its object. "The subject is the matter to which an act relates; the object, the purpose to be accomplished." Nichols v. Yandre, 151 Fla. 87, 91, 9 So.2d 157, 158 (1942). See also State v. Lee, 356 So.2d 276, 288 (Fla. 1978) (Sundberg, J., concurring in part, dissenting in part). The distinction between the subject of an act and its object is critical here.
As recognized by the majority, the object of 86-160 is to increase the affordability and availability of liability insurance. However, by the Court's own reckoning, included in this one act are at least four different subjects.[1] This is precisely the type of legislation prohibited by article III, section 6. In short, 86-160 is arguably the most gargantuan logroll in the history of Florida legislation.
The majority has come up with a new constitutional test to determine whether legislation meets the single subject requirement: "common sense." However, the majority has exercised none of that seemingly rare and precious commodity by its interpretation of article III, section 6. Its confusion lies in applying an incorrect analysis to the single subject requirement. Inquiring into the "germanity" required for testing whether a statute's provisions are properly connected to the subject of the act only arises if, in fact, there is one subject. The threshold question is based on common sense: does the act itself contain a single subject? If it does then the act's elements are examined to see whether they are in fact properly connected with, i.e., germane to, that single subject. If the act contains more than one subject, it is unconstitutional.
As stated, the purpose of the single subject requirement is to prevent logrolling. Various reasons have been articulated to show why logrolling is prohibited by constitutional provision. The single reason which I find to be particularly critical in assessing 86-160, is that a legislator "should not be put to the choice of accepting provisions affecting a subject matter totally alien to provisions effecting a subject *1098 matter with which he is sympathetic." State v. Lee, 356 So.2d at 287 (Sundberg, J., concurring in part, dissenting in part).
It can be argued that a legislator having to make such choices is simply a fact of life in the political decision making process. The response, of course, is that this type of quid pro quo ("you vote for my bill, I'll vote for yours") is not only beyond the reach of judicial inquiry, it is not the focus of article III, section 6. This constitutional provision exists to prevent this type of quid pro quo when a single act contains more than one subject. In other words, a multi-subject bill violates article III, section 6 because it presents the appearance that it was passed because the legislator had to make a constitutionally unacceptable choice between a subject which he favors and one which he does not.
For purposes of judicial analysis of article III, section 6, it is irrelevant whether all of the disparate provisions of 86-160 would have been enacted had they been properly placed into four different bills, each containing but a single subject. Our duty is to ensure that article III, section 6 is enforced: When more than one subject is contained in a bill, it has not been constitutionally enacted.
I accept the distinction noted by the majority between the single subject requirement contained in article XI, section 3 for constitutional initiative petitions, and article III, section 6, and agree that we should take a broader view of article III, section 6. While I also appreciate that reasonable people can differ on the interpretation to be given a constitutional provision, I suggest that an interpretation that renders a constitutional provision a nullity is blatantly and unequivocally unreasonable, and should not be countenanced by any court, solemnly charged with upholding the provisions of the "basic document that controls our governmental functions." At 1085.
I readily accept that the primary goal or object of this legislation was "the availability of affordable liability insurance." The majority rationalizes that since "civil litigation does have an effect on insurance" they are properly connected and hence pass constitutional muster. In short, as perceived by the majority, all is well constitutionally so long as the subjects are "properly connected."
Tort reform is a single subject. So is insurance reform. The fact that tort reform, as it may relate to civil litigation, does have an effect on insurance outlays and hence premiums, does not make it any less two subjects. The logic, or more properly the "illogic," employed by the majority can be extended to other single subjects which would meet the majority's "common sense" test and conceivably could have been joined in 86-160, without affecting the constitutionality of the bill, as perceived by the majority.[2] It is indeed difficult for me to accept that legislation dealing with joint and severable liability (section 60) and legislation permitting banks to own or control reinsurance companies (section 3) contains a single subject. These sections may very well be designed to bring about a single laudable goal or achieve a desirable objective, but article III, section 6 of Florida's Constitution, does not mandate single goals or objectives in legislation, but does mandate that each bill contain a single subject. 86-160 fails this constitutional test.
Under our constitutional scheme, power is diffused and each branch is to act within *1099 its proper sphere and serve as a check on unauthorized exercises of power by the other branches. When one branch abdicates its duty, the balance mandated by the constitution is thrown askew. Unless and until article III, section 6 is amended or repealed, this Court has no choice but to do its job: 86-160 contains more than one subject and is, therefore, unconstitutional. I would so declare.
BARKETT, J., and ADKINS, J. (Ret.), concur.
ADKINS, Justice (Ret.) concurring in part, and dissenting in part.
Torn between "good of the public" and applying the law, I voted with the majority in State v. Lee, 356 So.2d 276 (Fla. 1978), influenced by an alleged crisis in the insurance business. This was a mistake.
In Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981), we went a "wee bit" further in construing the single subject rule. I felt bound to concur because of my vote in Lee and, once more, there was an alleged crisis. Now I am again faced with an alleged crisis on one side and the one-subject constitutional provision on the other. WHERE WILL IT END? As we continue to expand our interpretation of the one-subject rule, it becomes more nebulous with each interpretation. We will become a court of men instead of a court of law, guided by an alleged crisis instead of the wording of the Constitution. The legislature interpreted our prior decisions as saying "Do whatever you want to do, as long as your decision is buttressed by a crisis."
I concur in the dissent of Justice Ehrlich.
NOTES
[1] For a substantial legislative history concerning this act, including an extensive report, see Florida Senate Commerce Committee, A Review of Historical Analysis  Current Perspectives on the Doctrine of Joint and Several Liability and a Review of Tort Reform (1986).
[2] The entire preamble to the act reads as follows:

WHEREAS, the Legislature finds that there is in Florida a financial crisis in the liability insurance industry, causing a serious lack of availability of many lines of commercial liability insurance, and
WHEREAS, the Legislature finds that professionals, businesses, and governmental entities are faced with dramatic increases in the cost of insurance coverage, and
WHEREAS, the absence of insurance is seriously adverse to many sectors of Florida's economy, and
WHEREAS, it is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their noneconomic losses, and
WHEREAS, the people of Florida are concerned with the increased cost of litigation and the need for a review of the tort and insurance laws, and
WHEREAS, the Legislature finds that certain commercial liability insurers are threatening to make insurance coverage less available and less affordable, which will seriously effect [sic] many sectors of Florida's economy, and
WHEREAS, the Legislature believes it is necessary to avoid an insurance availability crisis, to maintain economic stability, and to protect the people's rights to affordable insurance coverage in the interim before comprehensive reform measures are fully effective, and
WHEREAS, the Legislature finds that, in general, the cost of liability insurance is excessive and injurious to the people of Florida and must be reduced, and
WHEREAS, the Legislature finds that there are certain elements of damage presently recoverable that have no monetary value, except on a purely arbitrary basis, while other elements of damage are either easily measured on a monetary basis or reflect ultimate monetary loss, and
WHEREAS, the Legislature desires to provide a rational basis for determining damages for noneconomic losses which may be awarded in certain civil actions, recognizing that such noneconomic losses should be fairly compensated and that the interests of the injured party should be balanced against the interests of society as a whole, in that the burden of compensating for such losses is ultimately borne by all persons, rather than by the tortfeasor alone, and
WHEREAS, the Legislature finds that the current tort system has significantly contributed to the insurance availability and affordability crisis, and
WHEREAS, the Legislature finds that tort law and the liability insurance system are interdependent and interrelated, and
WHEREAS, comprehensive insurance regulatory reform and tort reform is necessary to improve the availability and affordability of commercial liability insurance, and
WHEREAS, the magnitude of this compelling social problem demands immediate and dramatic legislative action... .
[3] Schulte, Availability, Affordability, and Accountability: Regulatory Reform of Insurance, 14 Fla.St.U.L.Rev. 557 (1986) (footnotes omitted).
[4] "For example, within one year the Leonard Brothers Trucking Company faced fivefold increases in its cargo and real estate premiums and a fivefold increase in the premium on its $1 million liability policy. The price of its insurance went from $37,500 to $189,000. The company also was unable to purchase  at any price  a $20 million umbrella policy. The family that owned the company decided to liquidate the sixty-six-year-old firm.

... .
Governmental agencies were also affected. The Southwest Florida Water Management District's liability coverage was reduced from $10 million to $1 million with almost no reduction in premium. The Tampa Housing Authority faced a premium increase of $569,000  more than 490%  on its general liability policy. The City of Daytona Beach faced a 1,700% increase in its insurance premium." Id. at 558 (footnotes omitted).
[5] Id. at 561.
[6] Chapman merits no extended discussion. In Chapman, we simply held that subsequent legislative changes to the no-fault insurance statute had not changed the statutory conditions on which Lasky was based.
[7] See § 66(6).
[8] See infra note 1.
[9] Butterfield v. Forester, 103 Eng.Rep. 926 (K.B. 1809).
[10] The trial judge explained his rejection of this challenge to each of these sections as follows:

Sections 51 and 52 deal with the subject of punitive damages. Section 51 defines the conditions the plaintiff must meet to recover punitive damages. Section 52 limits the amount of punitive damages available in certain civil actions. In addition, section 52 specifies who shall receive any punitive damages so awarded. Section 51 is clearly substantive because it sets the standard for establishing a claim for punitive damages. The legislature, which has the authority to abolish punitive damages can surely set the standard for establishing such claims. The Court is of the view that both sections create substantive rights and further that any procedural provisions of these sections are intimately related to the definition of those substantive rights.
Section 53 is substantially similar to the statute on remittitur and additur which the Supreme Court has previously upheld in Adams v. Wright, 403 So.2d 391 (Fla. 1981). In Adams, the Supreme Court ruled that the statute was a "remedial statute designed to protect the substantive rights of litigants in motor vehicle-related suits."
Plaintiffs correctly argue that section 54 deals with practice and procedure. If this provision were mandatory, plaintiffs' constitutional argument that section 54 unlawfully encroaches upon the prerogatives of the Florida Supreme Court would be well taken. However, the legislature made this provision entirely optional with the courts. Unless the court be so minded it need not hold a settlement conference. This court agrees that section 54 is no more than an expression by the legislature of its desire that cases be settled rather than be litigated.
Section 56 requires that the jury itemize its award into economic, noneconomic and punitive damages. This characterization of damages relates directly to the substantive law imposing limitations on certain types of damages. It is substantive in nature and within the legislative authority to enact.
Section 57 provides alternative methods of payment of future economic damages which exceed $250,000. The Florida Supreme Court has upheld a statute which provides that, in medical malpractice actions, future medical expenses and future lost wages may be paid as they are actually incurred. Florida Patients Compensation Fund v. Von Stetina, 474 So.2d 783 (Fla. 1985). The Court ruled that this means of paying future damages "is within the constitutional prerogative of the legislature." In according defendants a conditional substantive right to pay judgments exceeding $250,000 in installments as the injured person's loss accrues, this section clearly creates a substantive right and does not impermissively regulate procedural practice in Florida courts.
Section 58 awarding attorneys' fees under certain conditions creates substantive rights. A similar provision relating to medical malpractice cases was upheld in Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985).
[1] 1) Long term and short term insurance reform, 2) tort reform, 3) creation of a task force to study tort reform and insurance reform and the effects of the bill, 4) modification of "financial responsibility requirements applicable to physicians" or in simpler terms, transfer money from Florida Medical Malpractice Joint Underwriting Association to a very small number of doctors.
[2] Example 1. It has been shown that there is a direct connection between speed on the highways and fatal accidents. When the speed limit was reduced to 55 mph, there was a substantial drop in fatalities which would lessen the claims outlay and in turn would have a positive effect on insurance rates. Example 2. Mandatory auto inspections would reduce the number of accidents, thereby having a positive effect on litigation and damages and insurance rates. Example 3. More stringent driver licensing requirements to insure more competent drivers would also have a positive effect on suits and damages and insurance premiums. Example 4. A limitation on fees paid to insurance agents would lower insurance costs and premiums. Example 5. Medical cost containment would reduce medical costs thereby lessening recoverable damages, with a positive effect on insurance outlays and corresponding insurance premiums.