[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 27, 2011
JOHN LEY
CLERK

_____

No. 09-16375

_____

D. C. Docket No. 07-00508-CV-MCR/EMT

ESTATE OF MICHELLE EVETTE MCCALL,
By and Through Co-Personal Representatives
Edward M. McCall II, Margarita F. McCall
and Jason Walley,
EDWARD M. MCCALL,
MARGARITA F. MCCALL,
JASON WALLEY,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 27, 2011)

Before EDMONDSON, and MARTIN, Circuit Judges, and HODGES,[*] District Judge.

MARTIN, Circuit Judge:

The central question presented in this appeal is whether Florida's cap on noneconomic medical malpractice damages, Fla. Stat. § 766.118, violates the Florida or United States Constitutions. The Estate of Michelle McCall, Ms. McCall's parents, and the father of Ms. McCall's son (collectively "Plaintiffs") also appeal the District Court's application of that statutory cap. After thorough review and having had the benefit of oral argument, we conclude that the District Court did not err in applying the cap. We also conclude that Florida's statutory cap passes muster under the Equal Protection Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment of the United States Constitution as well as the Takings Clause of Article X, § 6(a) of the Florida Constitution. Because no Florida Supreme Court decisions provide controlling guidance to resolve Plaintiffs' other challenges to this cap on noneconomic medical malpractice damages under that state's Constitution, we grant, in part, Plaintiffs' motion to certify questions to the Florida Supreme Court.

_____

[*] Honorable William Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

During June 2005, Michelle McCall received prenatal medical care at a United States Air Force clinic as an Air Force dependent. Ms. McCall opted for the Air Force's family practice department to provide primary prenatal care and delivery services throughout her pregnancy. She had a healthy and normal pregnancy until the last trimester. On February 21, 2006, test results revealed that Ms. McCall's blood pressure was high and that she was suffering from severe preeclampsia. Ms. McCall's serious condition required that labor be induced immediately.

Instead of transferring Ms. McCall to the OB/GYN department, the family practice department continued to provide medical care. The Air Force hospital was temporarily unavailable for obstetric and delivery services, so members of the family practice department transferred Ms. McCall to the Fort Walton Beach Medical Center instead. There, Air Force family practice doctors treated Ms. McCall for hypertension and induced labor. When Ms. McCall dilated to five centimeters, her contractions slowed and became weaker. The Air Force family practice doctors treating Ms. McCall called an Air Force obstetrician, Dr. Archibald, and asked if he could perform a cesarean section. Dr. Archibald reported that he was performing another surgery and would not be available to

perform a cesarean section on Ms. McCall until after he finished that surgery. The Air Force family practice doctors prepared Ms. McCall for a cesarean section but did not call other obstetricians to determine if one was available to provide immediate medical care.

On February 22, 2006, Dr. Archibald finally arrived to perform the cesarean section, but Ms. McCall's contractions had resumed and the Air Force family practice doctors decided to allow Ms. McCall to deliver vaginally. Dr. Archibald left the Fort Walton Medical Center. On February 23, 2006 at 1:25 a.m., Ms. McCall delivered a healthy baby boy. Family members who visited Ms. McCall after the delivery expressed concerns about the amount of blood Ms. McCall had lost during delivery. Medical personnel assured these family members that Ms. McCall was stable.

Thirty-five minutes later, when the placenta had not delivered as expected, two family practice doctors from the family practice department tried without success to manually extract the placenta. An Air Force nurse anesthetist administered additional epidural pain relief and gave Ms. McCall two separate doses of Morphine intravenously. Around 2:35 a.m., the family practice department doctors called Dr. Archibald, the obstetrician, for assistance when they could not remove the placenta manually.

4

Ms. McCall's blood pressure began to drop rapidly and remained dangerously low over the next two and a half hours. The Air Force nurse anesthetist monitoring Ms. McCall's vital signs did not notify the family practice doctors of the drop in Ms. McCall's blood pressure. Dr. Archibald arrived at 2:45 a.m. and removed the placenta within five minutes. The family practice department doctors informed Dr. Archibald that Ms. McCall had not lost much blood during delivery. Dr. Archibald, however, noticed severe vaginal lacerations and worked to repair them over the next hour. During that time, the Air Force nurse anesthetist monitored Ms. McCall's vital signs, reported to Dr. Archibald that they were stable, and failed to inform him that Ms. McCall's blood pressure was dangerously low and continuing to drop. Dr. Archibald never checked the vital signs himself and relied exclusively on the nurse to inform him of any blood pressure changes or problems.

At 3:50 a.m. when Dr. Archibald finished his work, he requested an immediate blood count and, if needed, a transfusion to compensate for the blood Ms. McCall lost during the procedure. Forty minutes later, the family practice department physician ordered the blood count test. Forty minutes after that, and over an hour after Dr. Archibald had requested immediate blood work, a nurse attempted to draw blood from Ms. McCall. Ms. McCall was unresponsive. She

had gone into shock and cardiac arrest as a result of severe blood loss. It is not clear how long Ms. McCall had been in this state, since no one had monitored her or checked her status for the hour following Dr. Archibald's procedure. Ms. McCall never regained consciousness and was removed from life support on February 27, 2006.

## II.

Plaintiffs sued the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80. After a two-day bench trial, the District Court found the United States liable under the FTCA because the negligence of its employees proximately caused Ms. McCall's death. The District Court found that Plaintiffs' economic damages, or financial losses, amounted to $980,462.40. The court found that Plaintiffs' noneconomic damages, or nonfinancial losses, totaled $2 million, including $500,000 for Ms. McCall's son and $750,000 for each of her parents.

The District Court applied Florida's statutory cap on noneconomic damages for medical malpractice claims and limited Plaintiffs' recovery of noneconomic damages to $1 million. See Fla. Stat. § 766.118(2). The District Court rejected Plaintiffs' argument that they were entitled to the full $2 million in noneconomic damages because they could recover under both the $1 million cap for

"practitoners" and the $1.5 million cap for "nonpractitioners." The Court also denied Plaintiffs' motion challenging the constitutionality of Florida's statutory cap under both the Florida and United States Constitutions.

Plaintiffs next filed a motion to alter or amend the judgment. Plaintiffs renewed their argument that they were entitled to recover up to $2.5 million under Florida's statutory cap. They argued that the District Court should have held the Eglin Air Force Base Hospital vicariously liable, as a "nonpractitioner," for the negligence of its practitioner employees. The District Court denied Plaintiffs' motion after finding that if the United States was vicariously liable for the negligence of its employees, any damages recoverable from it would be subject to Florida's $1 million cap for "practitioners." Thus, the court determined that Plaintiffs' recoverable noneconomic damages remained capped at $1 million.

On appeal, Plaintiffs challenge the District Court's rulings on both the application and constitutionality of Florida's cap on noneconomic damages for medical malpractice claims. Plaintiffs argue that Florida's statutory cap violates the Equal Protection Clause of Fourteenth Amendment and constitutes a taking in violation of the Fifth Amendment of the United States Constitution. Plaintiffs also argue that the cap violates the following provisions of the Florida Constitution: (1) the guarantee of separation of powers in Article II, § 3 and Article V, § 1; (2) the

7

right to trial by jury under Article I, § 22; (3) the right of access to the courts under Article I, § 21; (4) the right to equal protection under Article I, § 2; and (5) the prohibition against a taking of property without just compensation under Article X, § 6. We address each of these issues in turn, reviewing the district court's conclusions of law de novo and the district court's factual findings for clear error. See Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1230 (11th Cir. 2009).

III.

We first address whether the District Court properly applied Florida's cap on noneconomic damages. For a personal injury or wrongful death claim arising from the medical negligence of "practitioners," Florida's statute provides:

> (a) [R]egardless of the number of such practitioner defendants, noneconomic damages shall not exceed $500,000 per claimant. No practitioner shall be liable for more than $500,000 in noneconomic damages, regardless of the number of claimants.

> (b) Notwithstanding paragraph (a), if the negligence resulted in a permanent vegetative state or death, the total noneconomic damages recoverable from all practitioners, regardless of the number of claimants, under this paragraph shall not exceed $1 million . . . .

> (c) The total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate.

Fla. Stat. § 766.118(2). The statute includes a similar provision for claims against nonpractitioners. That provision limits noneconomic damages to $750,000 per

8

claimant, or $1.5 million in the aggregate recoverable by all claimants against all nonpractitioner defendants. Fla. Stat. § 766.118(3). The statute defines a "practitioner" as:

> any person licensed under chapter 458, chapter 459, chapter 460, chapter 461, chapter 462, chapter 463, chapter 466, chapter 467, or chapter 486 or certified under s. 464.012 . . . any association, corporation, firm, partnership, or other business entity under which such practitioner practices or any employee of such practitioner or entity acting in the scope of his or her employment . . . any person or entity for whom a practitioner is vicariously liable and any person or entity whose liability is based solely on such person or entity being vicariously liable for the actions of a practitioner.

Fla. Stat. § 766.118(1)(c). The statute does not define the term "nonpractitioner."

On appeal Plaintiffs argue for the first time that they should have recovered $1 million against Eglin Air Force Base Hospital as a nonpractitioner because it "is independently liable for its own breaches of duty under Florida law" for its "systemic" negligence. Plaintiffs waived that argument by failing to raise it before the District Court. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (quotation marks omitted)). Plaintiffs did not allege in their complaint that the hospital itself was directly liable for its negligent actions independent of those of its employees. Nor did Plaintiffs raise that argument in their motion to alter or amend the judgment.

9

Rather, in that motion Plaintiffs argued that the hospital should be held *vicariously* liable for the negligence of its employees.

The District Court properly found that any noneconomic damages recoverable from the hospital based on its vicarious liability fell within the $1 million cap for "practitioners." Florida's statute expressly provides that "the term 'practitioner' includes . . . any person or entity whose liability is based solely on such person or entity being vicariously liable for the actions of a practitioner." Fla. Stat. § 766.118(1)(c). The District Court also correctly characterized the certified registered nurse anesthetist, the family practice doctors and the obstetrician who provided Ms. McCall's medical care at the Fort Walton Beach Medical Center as "practitioners."[2] See Fla. Stat. §§ 766.118(1)(c), 464.012, 458.311.

The District Court was correct in finding that Plaintiffs did not establish that Ms. McCall's death resulted from the negligence of a "nonpractitioner." As the District Court observed, Plaintiffs' complaint did not identify any hospital staff or nurses by name except for the physicians, who are practitioners. The District Court also reported that "no evidence at trial singled out a specific nonpractitioner

---

[2] Plaintiffs conceded this point before the District Court and do not argue otherwise on appeal.

for negligent conduct." Our independent review of the trial record confirms that finding. While Plaintiffs' expert in obstetrics and gynecology opined about the negligence of the nurse anesthetist, family practice doctors and obstetrician who provided medical care to Ms. McCall, the expert did not discuss the potential negligence of any other members of the hospital staff. On this record, we conclude that the District Court did not err in applying Florida's cap on noneconomic damages for medical malpractice claims.

IV.

Plaintiffs next challenge the cap under several provisions of the Florida and United States Constitutions. We first address Plaintiffs' argument that the cap violates the United States Constitution. We then review Plaintiffs' challenge to the cap under the Takings Clause of the Florida Constitution, Art. X, § 6, because Florida constitutional law on the matter is well settled. Florida constitutional law on the other provisions of the Florida Constitution under which Plaintiffs challenge the statutory cap, however, is unsettled. For this reason, we will certify several questions of state constitutional law to the Florida Supreme Court under its certification procedure.

## A.

Plaintiffs argue that Florida's statutory cap on noneconomic damages for medical malpractice claims violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Under the Equal Protection Clause, "[s]ocial and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." Hodel v. Indiana, 452 U.S. 314, 331, 101 S. Ct. 2376, 2387 (1981); see also U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 175, 177, 101 S. Ct. 453, 459–60 (1980).

We reject Plaintiffs' argument that strict or intermediate scrutiny applies to our review of the statute under the Equal Protection Clause of the United States Constitution. Plaintiffs have not identified how the statute burdens a fundamental right or draws a suspect classification under federal law. We therefore analyze whether Florida's statutory cap is rationally related to a legitimate governmental purpose. See Hodel, 452 U.S. at 331, 101 S. Ct. at 2387. When applying rational basis review, we must uphold the statute against an equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 312,

313, 113 S. Ct. 2096, 2101 (1993). "[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." Id. at 315, 113 S. Ct. at 2102 (quotation marks omitted).

In enacting the statutory cap, the Florida legislature reported that a recent, dramatic increase in medical malpractice liability insurance premiums had increased the cost of medical care and decreased the availability of malpractice insurance. See Fla. Stat. § 766.201(1)(a). The legislature observed that "[t]he primary cause of increased medical malpractice liability insurance premiums has been the substantial increase in loss payments to claimants caused by tremendous increases in the amounts of paid claims." Id. § 766.201(1)(b). The legislature created the statutory cap on noneconomic damages in an effort to make malpractice insurance easier to obtain and reduce the cost of medical care. See id. § 766.201(1).

Plaintiffs argue that the statutory cap lacks a rational basis because the Florida legislature "had no objective, factual basis for believing" that a cap on noneconomic damages for medical malpractice claims would reduce the cost of medical malpractice insurance. That argument lacks merit. Before enacting the statutory cap, the Florida legislature's Select Committee prepared a report on the issue. See Florida House of Representatives, Select Committee on Medical

13

Liability Insurance Report (2003)[3] at 4.  Before issuing the report the legislature

held public hearings, heard expert testimony and reviewed a separate report

prepared by Governor Bush's Task Force on Healthcare Professional Liability

Insurance.  Id.  The Task Force report set forth that health care providers were

changing the scope of their practice, leaving Florida, or retiring because of

escalating medical malpractice premiums.  Id. at 15.  The Task Force

recommended that the legislature create a "per incident" medical malpractice cap

to remedy the problem.  Id. at 55.

By their argument, Plaintiffs ask us to second guess the legislature's

judgment in enacting a "per incident" rather than "per claimant" statutory cap.

However, "equal protection is not a license for courts to judge the wisdom,

fairness, or logic of legislative choices."  Beach Commc'ns, Inc., 508 U.S. at 313,

113 S. Ct. at 2101.  The legislature identified a legitimate governmental purpose in

passing the statutory cap, namely to reduce the cost of medical malpractice

_____

[3] Available at
http://www.myfloridahouse.gov/Sections/Documents/loaddoc.aspx?PublicationType=Committee
s&CommitteeId=2147&Session=2003&DocumentType=General%20Publications&FileName=2
103.pdf#xml=http://search/texis/search/pdfhi.txt?query=Report+of+Select+Committee+on+Medi
cal+Liability+Insurance&pr=PROD_MFHMain&rdepth=0&order=r&mode=admin&cq=&id=44
8e02b99 (last visited May 26, 2011).

Pursuant to Internal Operating Procedure 10, Citation to Internet Materials in an Opinion, under
Federal Rule of Appellate Procedure 36, a copy of the internet materials cited in this opinion is
available at the Eleventh Circuit Court of Appeal's Clerk's Office.

14

premiums and health care.  See Fla. Stat. § 766.201.  The means that Florida chose, a per incident cap on noneconomic damages, bears a rational relationship to that end.  The Florida legislature could reasonably have concluded that such a cap would reduce damage awards and in turn make medical malpractice insurance more affordable and healthcare more available.  We therefore conclude that Florida's statutory cap on noneconomic damages for medical malpractice claims does not violate the Equal Protection Clause of the United States Constitution.

B.

Plaintiffs next argue that Florida's statutory cap constitutes a taking of property without just compensation in violation of Article X, Section 6 of the Florida Constitution and the Fifth Amendment of the United States Constitution.  We disagree.  The Takings Clause of the United States Constitution provides that "private property" shall not "be taken for public use, without just compensation."  U.S. Const. Amend V.  The Takings Clause "does not undertake . . . to socialize all losses, but those only which result from a taking of property."  United States v. Willow River Power Co., 324 U.S. 499, 502, 65 S. Ct. 761, 764 (1945).  "[A]lthough a vested cause of action is property and is protected from arbitrary interference, [a litigant] has no property, in the constitutional sense, in any particular form of remedy . . . ."  Gibbes v. Zimmerman, 290 U.S. 326, 332, 54 S.

15

Ct. 140, 142 (1993) (analyzing challenge to a state statute under the Due Process Clause). Florida's statutory cap does not interfere with a vested right. "No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit." New York Cent. R.R. v. White, 243 U.S. 188, 198, 37 S. Ct. 247, 250 (1917). Moreover, Florida passed its statutory cap in 2003, long before the Plaintiffs' cause of action for the medical negligence that took place in 2006 vested. See 2003 Fla. Sess. Law Serv. 416 (West). We therefore conclude that Florida's cap does not constitute a taking under the United States Constitution.

Nor is the cap a taking under well-established Florida constitutional law. Florida's Takings Clause provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Fla. Const. Art. X, § 6(a). "Florida law is well established that the right to sue on an inchoate cause of action—one that has not yet accrued—is not a vested right because no one has a vested right in the common law . . . ." Raphael v. Shecter, 18 So. 3d 1152, 1157 (Fla. 4th DCA 2009) (quotation marks omitted). Because Florida's statutory cap does not deprive Plaintiffs of a vested right, there is no taking within the meaning of the Takings Clause of the Florida Constitution.

16

V.

Because this case raises important questions about the interpretation and application of Florida constitutional law in areas that remain unsettled, we will not decide Plaintiffs' remaining state constitutional claims,[4] but rather will grant Plaintiffs' motion to certify questions relating to those claims to the Florida Supreme Court.[5] See Fla. Const. art. V, § 3(b)(6); Fla. R. App. P. 9.150 ("On either its own motion or that of a party, . . . a United States court of appeals may certify a question of law to the Supreme Court of Florida if the answer is determinative of the cause and there is no controlling precedent of the Supreme

---

[4] We deny Plaintiffs' motion to certify questions about the constitutionality of the cap under the Taking Clause, Article X, Section 6(a), of the Florida Constitution and about the application of the cap to the facts of this case. We have addressed the merits of those claims under Florida law. We also deny Plaintiffs' motion to certify a question about the constitutionality of the cap under the Due Process Clause, Article I, Section 9, of the Florida Constitution. Plaintiffs waived their due process claim by failing to address it on the merits in their briefs. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (noting that an issue is waived if the party fails to argue the merits of the issue in its briefs).

[5]

The particular phrasing used in the certified question is not to restrict the Supreme Court's considerations of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.

Anderson v. Jackson Mun. Airport Auth., 645 F.2d 401, 403 n.5 (5th Cir. 1981) (quotation marks omitted). In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

17

Court of Florida.").  "Where there is doubt in the interpretation of state law, a federal court may certify the question to the state supreme court to avoid making unnecessary Erie guesses and to offer the state court the opportunity to interpret or change existing law."  Union Planters Bank, N.A. v. New York, 436 F.3d 1305, 1306 (11th Cir. 2006) (quotation marks omitted).  We certify the following questions to the Supreme Court of Florida:

> (1) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the right to equal protection under Article I, Section 2 of the Florida Constitution?
>
> (2) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the right of access to the courts under Article I, Section 21 of the Florida Constitution?
>
> (3) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the right to trial by jury under Article I, Section 22 of the Florida Constitution?[6]
>
> (4) Does the statutory cap on noneconomic damages, Fla. Stat. § 766.118, violate the separation of powers guaranteed by Article II, Section 3 and Article V, Section 1 of the Florida Constitution?

---

[6] The District Court concluded that "because this is an FTCA case, the plaintiffs had no right to trial by jury in the first place, and the court therefore has no occasion to consider [Plaintiffs' argument that the cap violates the right to trial by jury]."  Plaintiffs argue that the District Court did have occasion to consider their argument because the FTCA waives sovereign immunity and authorizes tort actions against the United States "in the same manner and to the same extent as a private individual under like circumstances."  See United States v. Orleans, 425 U.S. 807, 813, 96 S. Ct. 1971, 1975 (1976).  Plaintiffs argue that, if the statutory cap violates the right to jury trial in state suits against private parties, the cap is void in the state courts, therefore, it is void in the FTCA context as well.  We agree with Plaintiffs and therefore certify this question to the Florida Supreme Court.

18

## VI.

We affirm the district court's application of Florida's statutory cap on noneconomic damages.  We also conclude that the cap comports with the Equal Protection and Takings Clauses of the United States Constitution.  We conclude that the statute does not constitute a taking in violation of the Takings Clause of the Florida Constitution, and we grant Plaintiff's motion to certify questions regarding Plaintiffs' remaining challenges to the cap under state constitutional law to the Florida Supreme Court.

AFFIRMED, in part, and QUESTIONS CERTIFIED.

Plaintiffs' Motion to Certify Questions, GRANTED, in part, and DENIED, in part.