POLSTON, C.J.,
dissenting.
I respectfully dissent because the plurality disregards the rational basis standard prescribed by our precedent as well as the Legislature’s policy role under Florida’s constitution. The Legislature’s policy choice of enacting a cap of $1 million on noneconomic damages in medical malpractice cases involving death is rationally related to the legitimate state interest of decreasing medical malpractice insurance rates and increasing the affordability and availability of health care in Florida. Therefore, under our precedent, the cap does not violate Florida’s constitutional guarantee of equal protection. It also does not violate the access to courts, jury trial, and separation of powers provisions of the Florida Constitution. Accordingly, I would answer the four certified questions posed by the Eleventh Circuit Court of Appeals in the negative.
I. Background
Justice Lewis’ plurality opinion accurately quotes the Eleventh Circuit’s description of Michelle McCall’s tragic death following the birth of her son. Ms. McCall’s parents and her son’s father (on behalf of her son) filed suit against the United States pursuant to the Federal Tort Claims Act (FTCA), which provides that the United States is liable for torts to the same extent as a private individual would be under the applicable state’s law. Estate of McCall v. United States, 642 F.3d 944, 947 (11th Cir.2011); Estate of McCall v. United States, 663 F.Supp.2d 1276, 1288 (N.D.Fla.2009). After a two-day bench trial, the federal district court ruled that the United States was liable for Ms. McCall’s death and found that “Plaintiffs’ economic damages, or financial losses, amounted to $980,462.40.” McCall, 642 F.3d at 947. Additionally, the federal district court “found that Plaintiffs’ noneco-nomic damages, or nonfinancial losses, totaled $2 million, including $500,000 for Ms. McCall’s son and $750,000 for each of her parents.” Id. The federal district court then applied Florida’s statutory cap pursuant to section 766.118(2), Florida Statutes *923 (2005), to limit Plaintiffs’ recovery for non-economic damages to an aggregate of $1 million. Id. The $1 million capped amount for noneconomic damages “will be equitably divided among the eligible survivors in proportion to their respective awards.” McCall, 663 F.Supp.2d at 1295. The federal district court “also denied Plaintiffs’ motion challenging the constitutionality of Florida’s statutory cap under both the Florida and United States Constitutions.” McCall, 642 F.3d at 947.
On appeal, the Eleventh Circuit considered multiple constitutional challenges to Florida’s statutory cap on noneconomic damages. First, the Eleventh Circuit applied rational basis review to hold that Florida’s cap does not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. Id. at 950-51. The Eleventh Circuit reasoned as follows:
Plaintiffs ask us to second guess the legislature’s judgment in enacting a “per incident” rather than “per claimant” statutory cap. However, “equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.” Beach Commc’ns, Inc., 508 U.S. at 313, 113 S.Ct. at 2101. The legislature identified a legitimate governmental purpose in passing the statutory cap, namely to reduce the cost of medical malpractice premiums and health care. See Fla. Stat. § 766.201. The means that Florida chose, a per incident cap on noneconomic damages, bears a rational relationship to that end. The Florida legislature could reasonably have concluded that such a cap would reduce damage awards and in turn make medical malpractice insurance more affordable and healthcare more available.
Id. at 951. The Eleventh Circuit also rejected the plaintiffs’ argument that the cap fails rational basis review because “the Florida legislature ‘had no objective, factual basis for believing’ that a cap on noneco-nomic damages ... would reduce the cost of medical malpractice insurance.” Id. at 950. To the contrary, the Eleventh Circuit found the Legislature issued a report on the issue, held public hearings, heard expert testimony, and reviewed another report prepared by the Governor’s Task Force that recommended a per incident cap to remedy the problem. Id. at 950-51.
Additionally, the Eleventh Circuit held that the cap on noneconomic damages does not constitute a taking either under the Fifth Amendment to the United States Constitution or under section 6 of article X of the Florida Constitution. Id. at 951. The Eleventh Circuit stated that the cap does not deprive the plaintiffs of a vested right, explaining that the cap was enacted in 2003 before the medical malpractice at issue in the case took place in 2006. Id.
Finally, rather than deciding the plaintiffs’ remaining challenges to the cap under the Florida Constitution, the Eleventh Circuit certified to this Court the following questions:
(1) Does the statutory cap on noneco-nomic damages, Fla. Stat. § 766.118, violate the right to equal protection under Article I, Section 2 of the Florida Constitution?
(2) Does the statutory cap on noneco-nomic damages, Fla. Stat. § 766.118, violate the right of access to the courts under Article I, Section 21 of the Florida Constitution?
(3) Does the statutory cap on noneco-nomic damages, Fla. Stat. § 766.118, violate the right to trial by jury under Article I, Section 22 of the Florida Constitution?
(4) Does the statutory cap on noneco-nomic damages, Fla. Stat. § 766.118, violate the separation of powers guaran *924 teed by Article II, Section 3 and Article V, Section 1 of the Florida Constitution?
Id. at 952-53.
II. Florida’s Caps on Noneconomic Damages
Section 766.118, Florida Statutes (2005), places limitations on noneconomic damages[11] in medical malpractice cases, and the limitations vary depending upon the circumstances. For cases involving the negligence of practitioners providing non-emergency care, the limitation is $500,000 per claimant, per incident, and per practitioner:
With respect to a cause of action for personal injury or wrongful death arising from medical negligence of practitioners, regardless of the number of such practitioner defendants, noneco-nomic damages shall not exceed $500,000 per claimant. No practitioner shall be liable for more than $500,000 in noneconomic damages, regardless of the number of claimants.
§ 766.118(2)(a), Fla. Stat. (2005). If the negligence resulted in death or a permanent vegetative state, the cap rises to $1 million:
Notwithstanding paragraph (a), if the negligence resulted in a permanent vegetative state or death, the total non-economic damages recoverable from all practitioners, regardless of the number of claimants, under this paragraph shall not exceed $1 million.
§ 766.118(2)(b), Fla. Stat. (2005). The cap also rises to $1 million dollars in the absence of death or a permanent vegetative state if the trial court determines that a manifest injustice would occur or if the negligence resulted in a catastrophic injury. Id. However, section 766.118(2)(c), Florida Statutes (2005), emphasizes that “[t]he total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate.”
For cases involving nonpractitioners providing nonemergency care, the limitation is $750,000. § 766.118(3)(a), Fla. Stat. (2005). This cap rises to $1.5 million if the negligence caused a permanent vegetative state or death or if the trial court determines that a manifest injustice would occur or if the trier of fact determines that a catastrophic injury resulted. § 766.118(3)(b), Fla. Stat. (2005). And section 766.118(3)(d), Florida Statutes (2005), provides that “[t]he total noneconomic damages recoverable by all claimants from all nonpractitioner defendants under this subsection shall not exceed $1.5 million in the aggregate.”
These limitations on noneconomic damages are part of an overall legislative plan enacted in 2003 to address the rising costs of medical liability insurance and the affordability and availability of healthcare in Florida. See ch.2003-416, Laws of Fla. Other components of the plan include new healthcare facilities regulations, insurance regulation, license requirements, and agency requirements. Id.
The legislative effort began with the convening of the House Select Committee on Medical Liability Insurance, which “conducted an inquiry into the possible causes and potential solutions to the vexing problems associated with the availabili *925 ty of medical liability insurance in Florida.” Fla. H. Select Comm, on Med. Liab. Ins., Select Comm. on Med. Liab. Ins. Rep., at 2 (March 2008) (available at Fla. Dept, of State, Fla. State Archives, Tallahassee, Fla.). The Select Committee examined “how the reduced availability of affordable medical liability insurance affects the availability of medical services” and was “mindful of the need to maintain the right of access to redress when citizens are harmed during the delivery of medical services.” Id. at 3. The Select Committee held a series of meetings in Tallahassee, held four hearings outside the capital, and published an 82 page report (not including appendices). Id. It “received testimony from experts in each of the professional areas impacted” and reviewed records from efforts to address prior crises. Id. at 4.
The Select Committee also reviewed the record of the Governor’s Select Task Force on Health Care Professional Liability Insurance, which produced a “345 page report as well as thirteen volumes of supportive materials.” Id. at 9. The Governor’s Task Force “undertook a comprehensive review of published studies and relevant literature” and held ten meetings at which it received extensive testimony and information. Gov.’s Select Task Force on Healthcare Prof. Liab. Ins., Gov.'s Task Force on Healthcare Prof. Liab. Ins. Rep., at 3, iv (2003). The five members of the Governor’s Task Force were (1) John Hitt, President of University of Central Florida, (2)Richard Beard, Trustee of University of South Florida, (3) Marshall Criser, Jr., President Emeritus of University of Florida, (4) Fred Gainous, President of Florida A & M University, and (5) Donna Shalala, President of University of Miami. Id. at 3. In the end, the Legislature based many of its findings and its policies upon the work of the Governor’s Task Force, including the per incident cap on noneco-nomic damages. See, e.g., ch.2003-416, § 1, Laws of Fla.
Specifically, when enacting chapter 2003-416, Laws of Florida, the Legislature made the following findings:
(1) The Legislature finds that Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude.
(2) The Legislature finds that this crisis threatens the quality and availability of health care for all Florida citizens.
(3) The Legislature finds that the rapidly growing population and the changing demographics of Florida make it imperative that students continue to choose Florida as the place they will receive their medical educations and practice medicine.
(4) The Legislature finds that Florida is among the states with the highest medical malpractice insurance premiums in the nation.
(5) The Legislature finds that the cost of medical malpractice insurance has increased dramatically during the past decade and both the increase and the current cost are substantially higher than the national average.
(6) The Legislature finds that the increase in medical malpractice liability rates is forcing physicians to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine.
(7) The Legislature finds that there are certain elements of damage presently recoverable that have no monetary value, except on a purely arbitrary basis, while other elements of damage are either easily measured on a monetary basis or reflect ultimate monetary loss.
(8) The Governor created the Governor’s Select Task Force on Healthcare *926 Professional Liability Insurance to study and make recommendations to address these problems.
(9) The Legislature has reviewed the findings and recommendations of the Governor’s Select Task Force on Healthcare Professional Liability Insurance.
(10) The Legislature finds that the Governor’s Select Task Force on Healthcare Professional Liability Insurance has established that a medical malpractice crisis exists in the State of Florida which can be alleviated by the adoption of comprehensive legislatively enacted reforms.
(11) The Legislature finds that making high-quality health care available to the citizens of this state is an overwhelming public necessity.
(12) The Legislature finds that ensuring that physicians continue to practice in Florida is an overwhelming public necessity.
(13) The Legislature finds that ensuring the availability of affordable professional liability insurance for physicians is an overwhelming public necessity.
(14) The Legislature finds, based upon the findings and recommendations of the Governor’s Select Task Force on Healthcare Professional Liability Insurance, the findings and recommendations of various study groups throughout the nation, and the experience of other states, that the overwhelming public necessities of making quality health care available to the citizens of this state, of ensuring that physicians continue to practice in Florida, and of ensuring that those physicians have the opportunity to purchase affordable professional liability insurance cannot be met unless a cap on noneconomic damages is imposed.
(15) The Legislature finds that the high cost of medical malpractice claims can be substantially alleviated by imposing a limitation on noneconomic damages in medical malpractice actions.
(16) The Legislature further finds that there is no alternative measure of accomplishing such result without imposing even greater limits upon the ability of persons to recover damages for medical malpractice.
(17) The Legislature finds that the provisions of this act are naturally and logically connected to each other and to the purpose of making quality health care available to the citizens of Florida.
(18) The Legislature finds that each of the provisions of this act is necessary to alleviate the crisis relating to medical malpractice insurance.
III. Equal Protection
McCall argues that Florida’s cap of $1 million on noneconomic damages pursuant to section 766.118(2)(b), Florida Statutes, violates the right to equal protection under the Florida Constitution by imposing additional burdens when an act of medical negligence gives rise to multiple claims as well as when the negligent act causes severe injuries. However, under the rational basis test our precedent requires, McCall’s argument is without merit.
Article I, section 2 of the Florida Constitution provides that “[a]ll natural persons, female and male alike, are equal before the law....” Florida’s courts have interpreted this provision consistently with interpretations of the equal protection clause of the United States Constitution. See, e.g., Duncan v. Moore, 754 So.2d 708, 712 (Fla.2000); Sasso v. Ram Prop. Mgmt., 431 So.2d 204, 211 (Fla. 1st DCA 1983).
As this Court explained in Duncan, 754 So.2d at 712 (citations omitted),
[e]qual protection is not violated merely because some persons are treat *927 ed differently than other persons. It only requires that persons similarly situated be treated similarly. In the absence of a fundamental right or a protected class, equal protection demands only that a distinction which results in unequal treatment bear some rational relationship to a legitimate state purpose. This is known as the rational basis test.
In this case, McCall argues that section 766.118(2)(b)’s cap on noneconomic damages creates unequal treatment between those with noneconomic damages over the cap and those with noneconomic damages under the cap, claiming that the most severely injured are discriminated against. McCall also claims that the per incident cap creates a discriminatory classification between those who are members of larger families and those who are not. Because these alleged classifications do not involve a protected class or a fundamental right, McCall’s equal protection claim must be analyzed using the rational basis test.
“Under a ‘rational basis’ standard of review a court should inquire only whether it is conceivable that the regulatory classification bears some rational relationship to a legitimate state purpose[:]”
The burden is upon the party challenging the statute or regulation to show that there is no conceivable factual predicate which would rationally support the classification under attack. Where the challenging party fails to meet this difficult burden, the statute or regulation must be sustained.
Fla. High Sch. Activities Ass’n v. Thomas, 434 So.2d 306, 308 (Fla.1983); see also Westerheide v. State, 831 So.2d 93, 112 (Fla.2002). It is not the judiciary’s task under the rational basis standard “to determine whether the legislation achieves its intended goal in the best manner possible, but only whether the goal is legitimate and the means to achieve it are rationally related to the goal.” Loxahatchee River Envtl. Control Dist. v. Sch. Bd. of Palm Beach Cnty., 496 So.2d 930, 938 (Fla. 4th DCA 1986).
This Court has employed the rational basis test in its prior decisions involving equal protection challenges to limitations on damages in medical malpractice cases. For example, in Pinillos v. Cedars of Lebanon Hospital Corp., 403 So.2d 365 (Fla.1981), this Court applied a rational basis analysis when rejecting an equal protection challenge under both the Florida and federal constitutions to a statute that required judgments in medical malpractice actions to be reduced by amounts received from collateral sources. This Court explained that the Legislature, when enacting the statute, had determined that there was a medical malpractice liability insurance crisis in Florida that was threatening public health. Pinillos, 403 So.2d at 367. Then, this Court concluded that “the classification created by section 768.50[, Florida Statutes (1979),] bears a reasonable relationship to the legitimate state interest of protecting the public health by ensuring the availability of adequate medical care for the citizens of this state.” Id. at 368.
In 1993, in a case primarily denying an access to courts challenge, this Court held that caps on noneconomic damages in certain medical malpractices cases did not violate equal protection under either the United States or Florida constitutions. See Univ. of Miami v. Echarte, 618 So.2d 189 (Fla.1993) (“[W]e have also considered the other constitutional claims and hold that the statutes do not violate the right to trial by jury, equal protection guarantees, substantive or procedural due process rights, the single subject requirement, the taking clause, or the non-delegation doctrine.”). The statutes at issue in Echarte capped noneconomic damages in medical *928 malpractice cases at $250,000 if the parties agreed to arbitrate. Id. at 193 (describing section 766.207(7), Fla. Stat. (Supp.1988)). They also capped noneconomic damages at $350,000 if the plaintiff proceeded to trial after refusing a defendant’s offer to arbitrate. Id. (describing section 766.209(4), Fla. Stat. (Supp.1988)).
Thereafter, in April 2000, this Court held that the statute precluding adult children from recovering noneconomic damages for a parent’s death due to medical malpractice did not violate the equal protection guarantees of the Florida and federal constitutions. See Mizrahi v. N. Miami Med. Ctr., 761 So.2d 1040 (Fla.2000). In Mizrahi, this Court employed the rational basis test and explained that “the Legislature referred to and discussed the medical malpractice crisis and its adverse impact on the accessibility of health care during the passage of section 768.21.” Id. at 1042. And this Court stated that it had previously recognized the medical malpractice crisis as a legitimate state interest in Echarte. Id. at 1042 n. 3. This Court further explained that “limiting claims that may be advanced by some claimants would proportionally limit claims made overall and would directly affect the cost of providing health care by making it less expensive and more accessible.” Id. at 1043. Thus, because the exclusion is rationally related to controlling costs and healthcare accessibility, the statute at issue in Mizr-ahi did not violate equal protection. Id.
But, in June 2000, this Court in dicta expressed equal protection concerns about the noneconomic damages caps that had previously passed constitutional muster in EchaHe. See St. Mary's Hosp. v. Phillipe, 769 So.2d 961 (Fla.2000). In Phillipe, this Court held that the noneconomic damages caps under section 766.207 applied to claimants individually rather than on a per incident basis. 769 So.2d at 972. In reaching this holding, this Court first concluded that “section 766.207(7)(b) is neither clear nor unambiguous.” Id. at 968. Then, this Court found that the Legislature’s intent with the statute was to “provide substantial incentives to claimants and defendants to voluntarily submit their cases to binding arbitration” and that this intent “can be obtained by interpreting section 766.207(7)(b) so that each claimant is fairly and reasonably compensated for his or her pain and suffering.” Id. at 970. Moreover, this Court stated, “were we to interpret the noneconomic damages cap to apply to all claimants in the aggregate, we conclude that such an interpretation would create equal protection concerns.” Id. at 971. Thus, this Court mentioned in Phil-lipe that “[differentiating between a single claimant and multiple claimants bears no rational relationship to the Legislature’s stated goal of alleviating the financial crisis in the medical liability insurance industry.” Id.
However, this Court very recently rejected a challenge that was nearly identical to the equal protection concern this Court had mentioned in Phillipe. Specifically, in Samples v. Florida Birth-Related Neurological Injury Compensation Ass’n, 114 So.3d 912, 917 (Fla.2013), the Samples argued that the $100,000 parental award under the Florida Birth-Related Injury Compensation Plan violated equal protection under the Florida and federal constitutions because “those parents who apply for an award alone can receive twice the amount awarded to parents who share or split a parental award.” Applying the rational basis test, this Court in Samples concluded that “[ljimiting the parental award to $100,000 per claim — as opposed to per parent — is rationally related to maintaining the actuarial soundness of the Plan.” Id. Therefore, this Court upheld the statutory provision. Id.
*929 Similar to this Court’s precedent, the Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits have all upheld limitations on noneconomic damages in medical malpractice cases against equal protection challenges. See McCall, 642 F.3d at 951; Smith v. Botsford Gen. Hosp., 419 F.3d 513, 520 (6th Cir.2005) (“By limiting at least one component of health care costs, the noneconomic damages limitation is rationally related to its intended purpose.”) (quoting Zdrojewski v. Murphy, 254 Mich. App. 50, 657 N.W.2d 721, 739 (2002)); Boyd v. Bulala, 877 F.2d 1191, 1197 (4th Cir.1989) (holding that cap on all damages, including economic damages, does not deny equal protection because it “bears a reasonable relation to a valid legislative purpose — the maintenance of adequate health care services in the Commonwealth of Virginia”); Davis v. Omitowoju, 883 F.2d 1155, 1158 (3d Cir.1989) (“Clearly the Virgin Island’s decision to curb, through legislation, the high costs of malpractice insurance and thereby promote quality medical care to the residents of the islands, provides a rational basis for capping the amount of damages that can be awarded a plaintiff.”); Lucas v. United States, 807 F.2d 414, 422 (5th Cir.1986) (“Lucas has failed to convince us that there is no reasonable basis for the Texas legislature to conclude that this ceiling on recovery from certain institutions is not conceivably related to the availability and cost of malpractice insurance and that such insurance and the distribution of medical care in Texas are not conceivably linked.”); Hoffman v. United States, 767 F.2d 1431, 1437 (9th Cir.1985) (“The record clearly supports a finding that the California Legislature had a ‘plausible reason’ to believe that the limitations on noneconomic recovery would limit the rise in malpractice insurance costs.”).
Additionally, multiple state courts have rejected equal protection challenges to statutory caps on noneconomic damages. See, e.g., Fein v. Permanente Med. Grp., 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985); Zdrojewski v. Murphy, 254 Mich.App. 50, 657 N.W.2d 721 (2002); Adams v. Children’s Mercy Hosp., 832 S.W.2d 898 (Mo.1992), overruled on other grounds by Watts v. Lester E. Cox Med. Ctrs., 376 S.W.3d 633, 636 (Mo.2012); Judd, v. Drezga, 103 P.3d 135 (Utah 2004); Etheridge v. Med. Ctr. Hosps., 237 Va. 87, 376 S.E.2d 525 (1989); Robinson v. Charleston Area Med. Ctr. Inc., 186 W.Va. 720, 414 S.E.2d 877 (1991).
Applying our rational basis precedent, it is clear that the statutory cap in this case passes constitutional muster. When enacting the noneconomic damages cap at issue here, the Legislature found that “Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude” and that “this crisis threatens the quality and availability of health care for all Florida citizens.” Ch.2003-416, at § 1. The Legislature concluded that the “cost of medical malpractice insurance has increased dramatically during the past decade” and that “both the increase and the current cost are substantially higher than the national average.” Id. As a result, physicians are being forced “to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine.” Id.
This Court has previously recognized the existence of a medical malpractice insurance crisis as a legitimate state interest. See Mizrahi, 761 So.2d at 1042 n. 3; Echarte, 618 So.2d at 196-97. Further, it is undisputed that increasing the quality, availability, and affordability of health care for Floridians is a legitimate state interest. And the Legislature’s policy choice of enacting a cap on noneconomic damages in medical malpractice cases is rationally re *930 lated to these state interests. As this Court explained in Mizrahi, 761 So.2d at 1043, “limiting claims that may be advanced by some claimants would proportionally limit claims made overall and would directly affect the costs of providing health care by making it less expensive and more accessible.” In fact, “it is hard to conceive a more rational means of assuaging the fear of huge damage awards and reining in insurance costs in the case of a victim’s death than by limiting noneco-nomic wrongful death damages.” Mamin v. Hall, 274 Wis.2d 28, 682 N.W.2d 866, 890-91 (2004).
More specifically, the Florida Legislature could have rationally believed that the cap on noneconomic damages under section 766.118(2)(b) would reduce malpractice damage awards, which would thereby increase predictability in the medical malpractice insurance market and lead to reduced insurance premiums. Then, as a result of decreased insurance premiums, physicians would be more willing to stay in Florida and perform high-risk procedures at a lower cost to Floridians.[12]
McCall contends that the cap at issue in this case violates Florida’s equal protection guarantee because it applies on a per incident, rather than a per claimant, basis. However, the Legislature could have reasonably believed that a per incident cap would more effectively reduce noneconomic damages awards and create more stability in the insurance market than a per claimant cap would. A per incident cap leads to more predictability in the insurance market since the noneconomic damages cannot exceed the cap in any particular instance of malpractice regardless of the number of individual claimants. And the Legislature could have reasonably believed that this increased predictability would more effectively decrease medical malpractice insurance rates, thereby keeping more physicians in Florida to provide more access to quality health care (including high-risk procedures) at a lower cost to Floridians.
As a federal district court ably stated when rejecting a similar per incident argument regarding the same statutory cap at issue here,
[t]he aggregate limit on non-economic damages — applying to each incident regardless of the number of claimants— serves precisely the same legitimate interest served by individual caps: by reducing damage awards, limits on damages make medical malpractice insurance more affordable and quality healthcare services more available. A cap applicable to each occurrence, in cooperation with caps individually applicable to each claimant, reduces damage awards as a matter of mathematical certainty, enhances needed predictability, places a calculable limit on the exposure of healthcare and insurance providers, reduces malpractice *931 insurance premiums, and promotes the availability of quality healthcare.
M.D. v. United States, 745 F.Supp.2d 1274, 1280-81 (M.D.Fla.2010).
McCall also argues that the noneconomic damages cap violates equal protection because the more severely injured may not recover their full damages, unlike those whose damages fall under the cap. However, if this were an equal protection violation, no cap on damages could survive equal protection review because all caps have that effect. And this Court has rejected equal protection challenges to caps on damages previously. See Echarte, 618 So.2d 189; see also Phillipe, 769 So.2d 961. In fact, in Echarte, this Court rejected an equal protection challenge under the Florida Constitution to statutory caps on non-economic damages when the parties and amici advanced the precise argument that McCall raises here, namely that the non-economic damages cap discriminated against the most severely injured. Therefore, under this Court’s precedent, McCall’s equal protection argument based upon the fact that some may not fully recover is without merit. Ultimately, “the Legislature simply may have felt that it was fairer to malpractice plaintiffs in general to reduce only the very large noneco-nomic damage awards, rather than to diminish the more modest recoveries for pain and suffering and the like in the great bulk of cases.” Fein, 211 Cal.Rptr. 368, 695 P.2d at 683.
Rather than applying the analysis prescribed by our precedent, the plurality concludes that the statutory cap is “unfair” and “purely arbitrary” by citing two other state supreme courts and improperly relying on dicta from our decision in Phillipe, while ignoring the fact that this Court in Samples very recently rejected an argument that was nearly identical to the dicta expressed in Phillipe. See plurality op. at 901-03 (Lewis, J.).
Even more disturbingly, and as acknowledged by Justice Pariente to be inappropriate and unprecedented,[13] Justice Lewis’ plurality opinion addresses McCall’s equal protection challenge by conducting a de novo review of medical malpractice issues, overruling the findings made by the Legislature, and disregarding the evidence upon which those findings were based. Justice Lewis’ plurality opinion reweighs the evidence and disbelieves the Governor’s Task Force as well as the legislative testimony, claiming that its own independent review has revealed that the other two branches were incorrect and that a “bona fide medical malpractice crisis” probably did not and certainly does not currently exist. See id. at 905-10, 912-15. Additionally, despite the Legislature’s and the Task Force’s conclusions on the matter after reviewing the evidence, this plurality’s independent review has revealed that the “available data” “failed to establish a direct correlation between damage caps and reduced malpractice premiums.” Id. at 910, 912.
While the plurality clearly would have come to a different policy choice than the Legislature based upon the hardly unambiguous data[14] that the plurality could cull *932 from the record and the internet, that is not the point. Instead, our precedent dictates that we employ the rational basis test, which is a relatively easy test for a statute to pass and which recognizes and respects the Legislature’s role as the primary policymaker in our constitutional system. See McElrath v. Burley, 707 So.2d 836, 839 (Fla. 1st DCA 1998) (explaining that the rational basis test provides “minimal scrutiny” under which the challenger bears “a heavy burden”); see also Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (“This inquiry employs a relatively relaxed standard reflecting the Court’s awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one.”). In fact, the rational basis standard is less stringent than the deferential competent substantial evidence standard we employ when reviewing our own branch’s findings of fact.[15] Under the rational basis standard, there just has to be a conceivable factual predicate that would provide a rational reason for the Legislature to have done what it chose to do. See Fla. High School Activities Ass’n, 434 So.2d at 308 (“The burden is upon the party challenging the statute ... to show that there is no conceivable factual predicate which would rationally support the classification under attack....”). The statute does not need to be supported by unequivocal evidence in the record from the point in time when the statute was enacted or by more recent and allegedly authoritative reports posted on the internet. In other words, as Justice Pariente’s concurring in result opinion recognizes, this Court is not supposed to conduct an independent review of available data. See Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (“A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. ‘[A] legislative choice is not subject to courtroom factfind-ing and may be based on rational speculation unsupported by evidence or empirical data.’”) (quoting F.C.C. v. Beach Commc’ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Rather, if we can conceive of a possible factual predicate that provides a rational basis in furtherance of a legitimate state interest, the statute does not violate the equal protection provision of the Florida Constitution.
Here, applying the proper rational basis test, it is clear that the cap on noneconomic damages passes muster because it is rationally related to the legitimate state interest of decreasing medical malpractice insurance rates and increasing the affordability and availability of health care in Florida. Accordingly, I would answer the Eleventh Circuit’s equal protection question in the negative and then address its access to courts, jury trial, and separation of powers questions.
*933 IV. Access to Courts
Relying on this Court’s decision in Smith v. Department of Insurance, 507 So.2d 1080 (Fla.1987), McCall contends that section 766.118(2)’s $1 million cap on noneconomic damages does not satisfy the access to court test set forth in Kluger v. White, 281 So.2d 1 (Fla.1973). I would hold otherwise.
Section 21 of article I of the Florida Constitution provides that “[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.” In Kluger, 281 So.2d at 4, this Court enunciated the following test for determining whether a statute violates this constitutional guarantee:
[Wjhere a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.
In other words, to survive an access to courts challenge, a statute eliminating redress for an injury must satisfy at least one of two possible prongs: (1) either the statute must provide a reasonable alternative to redress the injury involved, or (2) the Legislature must show that there was “an overpowering public necessity for the abolishment” and that there was “no alternative method of meeting such public necessity.” Id.
In Echarte, 618 So.2d 189, this Court applied the second prong from Kluger to hold that the statutory eaps on noneco-nomic' damages in medical malpractice cases when a party requests arbitration do not violate the right of access to courts. Specifically, this Court upheld the $250,000 cap on noneconomic damages if the parties agree to voluntary binding arbitration as well as the $350,000 cap if the plaintiff refuses a defendant’s offer to arbitrate. In its analysis, this Court in Echarte ruled that the first Kluger alternative was satisfied because “[t]he defendant’s offer to have damages determined by an arbitration panel provides the claimant with the opportunity to receive prompt recovery without the risk and uncertainty of litigation or having to prove fault in a civil trial.” Echarte, 618 So.2d at 194. Next, this Court held that “[ejven if the medical malpractice arbitration statutes at issue did not provide a commensurate' benefit, we would find that the statutes satisfy the second prong of Kluger.” Id. at 195.
In Echarte, this Court explained that the judiciary exercises restraint when reviewing the legislative findings necessary to satisfy the second prong of Kluger. Specifically, this Court stated the “legislative determinations of public purpose and facts are presumed correct and entitled to deference, unless clearly erroneous.” Id. at 196. This Court explained that “[t]he Legislature has the final word on declarations on public policy, and the courts are bound to give great weight to legislative determinations of facts.” Id.
This Court in Echarte began its discussion of the legislative showing of an overwhelming public necessity by explaining that the preamble to the statute at issue “clearly states the Legislature’s conclusion that the current medical malpractice insurance crisis constitutes an ‘overpowering public necessity.’ ” Id. This Court also not *934 ed that the “Legislature made a specific factual finding that ‘[m]edical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased unavailability of malpractice insurance for some physicians.’ ” Id. (quoting § 766.201(l)(a)). Then, this Court concluded that the Legislature’s findings were supported by the work of the Academic Task Force for Review of the Insurance and Tort Systems, which found, among other things, that “a family physician who performs no surgery and practiced outside Dade and Broward Counties saw a 229% increase in medical malpractice insurance premiums.” Id. This Task Force had based its findings upon seven public hearings and meetings as well as surveys, research projects, and a literature review. Id. at 196 n. 17. Based upon this record, this Court concluded that “the Legislature has shown that an ‘overpowering public necessity’ exists.” Id. at 196-97.
Additionally, despite the lack of an express legislative finding on the matter, this Court in Echarte held that “the record supports the conclusion that no alternative or less onerous method exists.” Id. at 197. This Court noted that “in determining whether no alternative means exists to meet the public necessity of ending the medical malpractice crisis, the plan as a whole, rather than focusing on one specific part of the plan, must be considered.” Id. This Court explained that the Task Force believed that “reforms of the civil justice system, of the medical regulatory system, and of the insurance system complement each other” and that “all are necessary to address the complex problems with multiple causes” of the medical malpractice insurance crisis. Id. (quoting the Task Force’s recommendations to the Legislature). And this Court in Echarte rejected the contention that professional discipline alone would have been an alternative method to meet the public necessity at issue, explaining that “the Task Force specifically found that: ‘[sjtrengthened regulation of medical care providers is not a substitute for tort and insurance reform.’” Id. (quoting Task Force). “The Task Force specifically stated that even though a small percentage of the physicians were responsible for 42.2% of the total claims paid out, the facts did not support the conclusion that these doctors were incompetent.” Id. Thus, because it was “clear that both the arbitration statute, with its conditional limits on recovery of noneconomic damages, and the strengthened regulation of the medical profession are necessary to meet the medical malpractice insurance crisis,” this Court in Echarte held that the second prong of Kluger was satisfied. Id.
Similar to Echarte, the Legislature when enacting the statute at issue in this case expressly found that “Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude” and that “making high-quality health care available to the citizens of this state,” “ensuring that physicians continue to practice in Florida,” and “ensuring the availability of affordable professional liability insurance for physicians” are overwhelming public necessities. Ch.2003-416, at § 1. The Legislature specifically found that “Florida is among the states with the highest medical malpractice insurance premiums in the nation” and that “the cost of medical malpractice insurance has increased dramatically during the past decade and both the increase and the current cost are substantially higher than the national average.” Id. Further, the Legislature determined that “the increase in medical malpractice liability insurance rates is forcing physicians to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk *935 procedures, or to retire early from the practice of medicine.” Id.
These Legislative findings of an overwhelming public necessity are supported by the determinations of the Governor’s Task Force. For example, in its report, the Governor’s Task Force concluded that the cost of medical malpractice insurance had increased dramatically, explaining the following particulars:
In 2002 the average medical malpractice premium per doctor in Florida was 55 percent higher than the national average. Florida’s average insurance premiums have increased 64 percent since 1996 while nationally the average insurance premiums have increased 26 percent.
Gov.’s Task Force Rep. at v. The Task Force received specific testimony indicating that “[i]n Georgia, physicians pay from $5,000 to $6,000 for $1,000,000 of coverage. Thirty miles south, in Jacksonville, that costs $27,000.” Id. at 76. And the Task Force noted that:
[t]he Professional Medical Insurance Services, Inc., underwriters for Florida physicians, estimates that, in 2003, for OB/GYNs who presently have coverage, costs for $1 million dollar[s] of coverage will average between $70,000 and $110,000 per year; $250,000 of coverage will cost between $50,000 and $60,000 per year. For OB/GYNs seeking new insurance in 2003, estimates show that $1 million dollars in coverage will cost $150,000 per year[ ] and $250,000 in coverage will cost between $90,000 and $107,000 per year. As a result of these escalating costs, physicians are simply either under insuring or becoming uninsured with regard to their practices.
Id. at 306. The Task Force found that “[i]n Miami, evidence reflects that 80 percent of the OB/GYNs carry no insurance and those who do are paying over $207,000 per year for $1 million dollars worth of coverage.” Id. And “[t]he number of insurance companies writing medical malpractice policies in Florida went from a high of sixty-six companies in 1999 to twelve currently.” Id. at v. The Task Force also described testimony indicating that, as a result of these issues, over half the doctors in Florida that carry insurance can only afford to carry a $250,000 policy even though the most prevalent rate in the rest of the country is for a doctor to carry a $1,000,000 policy. Id. at 76. The Task Force further found that “[t]he concern over litigation and the cost and lack of medical malpractice insurance have caused doctors to discontinue high-risk procedures, turn away high-risk patients, close practices, and move out of the state.” Id. at vi. Indeed, “[i]n Broward County alone, 400 physicians have left the state, or retired early in the past year.” Id. at 72. The Task Force learned that “[i]n one instance, a Fort Lauderdale pediatric orthopedic surgeon’s premiums went from $32,000 to $96,000 a year.” Id. Due to this increase, the surgeon reported a plan “to return to his home state, Louisiana, as that state has tort reform.” Id. Therefore, because the Legislature’s factual and policy findings are presumed correct (as explained in Echarte), and because (as in Echarte) these findings are supported by the work of the Governor’s Task Force, the Legislature has shown the existence of an “overpowering public necessity.”
Regarding the “no alternative method” showing necessary to satisfy the second prong of Kluger, the Legislature expressly found that “the overwhelming public necessities of making quality health care available to the citizens of this state, of ensuring that physicians continue to practice in Florida, and of ensuring that those physicians have the opportunity to purchase affordable professional liability in *936 surance cannot be met unless a cap on noneconomic damages is imposed.” Ch.2003-416, at § 1(14), Laws of Fla. The Legislature determined that “the high cost of medical malpractice claims can be substantially alleviated by imposing a limitation on noneconomic damages” and that “there is no alternative measure of accomplishing such result without imposing even greater limits upon the ability of persons to recover damages for medical malpractice.” Ch.2003-416, at § 1(15), (16), Laws of Fla. The Legislature also found that “each of the provisions of this act is necessary to alleviate the crisis relating to medical malpractice insurance.” Ch.2003-416, at § 1(18), Laws of Fla.
The record supports these legislative findings and determinations. For instance, the Governor’s Task Force stated that, “without the inclusion of a cap on potential awards of non-economic damages in the package, no legislative reform plan can be successful in achieving a goal of controlling increases in healthcare costs and thereby promoting improved access to healthcare.” Gov.'s Task Force Rep. at 218. The Task Force noted that various other alternatives had been tried previously without success:
Since 1975, Florida has implemented (or attempted to implement) numerous alternatives to the cap on non-economic damages and the other reforms recommended in this Report. None, alone or together with the others, has solved the crisis of medical malpractice insurance availability and- affordability. Instead, Florida’s numerous attempts to solve this problem are nothing more than a failed litany of alternatives.
Id. at 219.
The Task Force explained that “one of the primary drivers of the current medical malpractice crisis is that a large percentage of medical malpractice losses (77 percent in Florida) apply to non-economic damages (i.e., pain and suffering).” Id. at 212. The Task Force also stated its belief that “caps on non-economic damages are particularly effective, because they limit the escalation of awards for pain and suffering, which fuels large increases for all awards and settlements.” Id. In fact, the Task Force thought that a cap on noneco-nomic damages was so important to alleviating the crisis and lowering premiums that it recommended a $250,000 per incident cap on noneconomic damages, rather than the $1 million per incident cap at issue in this case. See id. at xi. Based upon this record, the Legislature has shown that “no alternative or less onerous method exists.” Echarte, 618 So.2d at 197.
Accordingly, because the Legislature has shown an overpowering public necessity for the cap on noneconomic damages and that there is no alternative method of meeting the public necessity, the second prong of Kluger (as applied in Echarte) is satisfied. Therefore, section 766.118(2)(b) does not violate the right of access to court guaranteed by the Florida Constitution.
V. Jury Trial
McCall also contends that the cap on noneconomic damages violates the right to a jury trial guaranteed by the Florida Constitution. However, I would disagree and therefore answer the Eleventh Circuit’s certified question in the negative.
Article I, section 22 of the Florida Constitution provides that “[t]he right of trial by jury shall be secure to all and remain inviolate.” Florida’s “first constitution of 1838, which became effective upon Florida’s admittance to the Union in 1845, and all subsequent constitutions have contained similar provisions.” In re 1978 Chevrolet Van, 493 So.2d 433, 434 (Fla.1986). Thus, section 22 of article I “guarantees the right to trial by jury in those cases in which the right was enjoyed at the time *937 this state’s first constitution became effective in 1845.” Id.
This right to a jury trial is not implicated here because survivors of a wrongful death did not have the right to recover noneconomic damages in 1845. “It is well known that at common law the cause of action died with the person and that a parent had no right of action as parent for the wrongful death of a minor child.” Klepper v. Breslin, 88 So.2d 587, 592 (Fla.1955). Parents only gained this statutory right in 1899. Id. at 591. Other survivors were not entitled to recover pain and suffering damages until the Legislature enacted the Wrongful Death Act in 1972. See ch. 72-35, Laws of Fla.; Lifemark Hosps. of Fla., Inc. v. Afonso, 4 So.3d 764, 769 (Fla. 3d DCA 2009) (“A survivor’s right to recover pain and suffering did not become part of the Wrongful Death Act until 1972.... ”); see also Martin v. United Sec. Servs., Inc., 314 So.2d 765, 767-68 (Fla.1975) (describing the damages that were recoverable before and after the enactment of the Wrongful Death Act in 1972). Therefore, because the petitioners would not have had the right to recover damages from Ms. McCall’s death in 1845, the cap on noneconomic damages under section 766.118(2)(b) does not violate the right to a jury trial guaranteed by the Florida Constitution.
VI. Separation of Powers
Lastly, McCall contends that the cap on noneconomic damages violates the Florida Constitution’s provision ensuring separation of powers because the cap amounts to an impermissible legislative remittitur. I would reject this argument.
Article II, section 3 of the Florida Constitution provides that “[t]he powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.” As this Court has explained, “[gjenerally, the Legislature is empowered to enact substantive law while [the judicial' branch] has the authority to enact procedural law.” Massey v. David, 979 So.2d 931, 936 (Fla.2008). Therefore, “[i]f a statute is clearly substantive and operates in an area of legitimate legislative concern, this Court will not hold that it constitutes an unconstitutional encroachment on the judicial branch.” Id. at 937.
In Rowlands v. Signal Construction Co., 549 So.2d 1380, 1381-82 (Fla.1989) (footnote omitted), this Court explained remitti-tur as follows:
In its classic sense, the term “remitti-tur” means nothing more than “[t]he procedural process by which a verdict of the jury is diminished by subtraction.” Black’s Láw Dictionary 1164 (5th ed. 1979). Indeed, when remittitur was created in 1822 by Justice Story, it was for the express purpose of subtracting a specific amount from an excessive verdict if the plaintiff wanted to avoid the court’s alternative new-trial order. Blunt v. Little, 3 F.Cas. 760, 762 (No. 1578) (C.C.A.Mass.1822). See Note, Re-mittitur Practice in the Federal Courts, 76 Colum. L.Rev. 299, 300 (1976) (discussing history of remittitur). Thus, re-mittitur is proper where liability clearly exists, but the total dollar amount of damages is merely excessive.
In other words, “remittitur operates as a procedural device to bring the damages back within the outer bounds of law.” Rowlands, 549 So.2d at 1382 n. 1.
Here, the challenged cap does not invade the province of the judiciary because it does not operate as a legislative remitti-tur. The statutory cap establishes a limit to noneconomic damages in medical malpractice eases generally. It does not perform the judiciary’s function of reviewing *938 the specific support for particular damage awards in individual cases. Accordingly, “[bjecause the challenged law does not purport to vest the Legislature with authority to make a fact intensive, ease-by-case determination of the propriety of damage awards in individual cases, it does not usurp the authority of the judiciary.” M.D., 745 F.Supp.2d at 1281.
Moreover, in Smith, 507 So.2d at 1092, this Court rejected the argument that statutory limitations on punitive damages violated Florida’s separation of powers provision. See also Echarte, 618 So.2d at 191 (holding that the caps on noneconomic damages in medical malpractice cases where a party offers arbitration do not violate “the non-delegation doctrine”); Cauley, 403 So.2d at 387 (holding that caps on damages in tort cases against municipalities do not violate “the separation of powers rule”). This Court in Smith explained that “[wjhen the legislature enacted these provisions, it was addressing the substantive rights of plaintiffs and defendants in civil litigation actions with regard to recovery of damages.” 507 So.2d at 1092. This Court also approved the following reasoning the trial court employed when rejecting the separation of powers claim:
Sections 51 and 52 deal with the subject of punitive damages. Section 51 defines the conditions the plaintiff must meet to recover punitive damages. Section 52 limits the amount of punitive damages available in certain civil actions. In addition, section 52 specifies who shall receive any punitive damages so awarded. Section 51 is clearly substantive because it sets the standard for establishing a claim for punitive damages. The legislature, which has the authority to abolish punitive damages can surely set the standard for establishing such claims. The Court is of the view that both sections create substantive rights and further that any procedural provisions of these sections are intimately related to the definition of those substantive rights.
Id. at 1092 n. 10.
Like the punitive damages statute at issue in Smith, the statutory cap on non-economic damages at issue here addresses the substantive rights of parties with regard to the recovery of damages. And because section 766.118(2)(b) addresses substantive rights, it does not violate the separation of powers clause of the Florida Constitution.
VIL Conclusion
As explained above, the plurality chooses to disregard the rational basis standard prescribed by our precedent as well as the Legislature’s policy role under Florida’s constitution. Under our precedent, Florida’s per incident cap for a wrongful death action does not violate Florida’s constitutional guarantees of equal protection, access to courts, jury trial, and separation of powers. Therefore, I would answer the certified questions from the Eleventh Circuit in the negative. I respectfully dissent.
CANADY, J., concurs.

. Section 766.202(8), Florida Statutes (2005), defines noneconomic damages as "nonfinancial losses that would not have occurred but for the injury giving rise to the cause of action, including pain and suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of capacity for enjoyment of life, and other nonfinancial losses to the extent the claimant is entitled to recover such damages under general law, including the Wrongful Death Act.”

. In fact, die Governor’s Task Force, upon which the Legislature expressly relied, concluded as much:
[Ijmposing caps on non-economic damages in medical malpractice cases will significantly reduce the exposure of Florida healthcare providers to risk of loss from jury awards of inherently subjective damages. Such a reduction of risk will make malpractice losses much more predictable, and thereby lead to stability in malpractice insurance premium rates.
A reduction in potential liability and resulting stability will encourage more malpractice insurers to participate in the Florida market. This, along with the reduced exposure to risk, will permit insurers to charge lower premiums, on a sound financial basis. Lower premiums will encourage providers (particularly those in high-risk specialties) to offer healthcare services to Floridians, and persons visiting this state, and to do so at lower prices.
Gov.'s Task Force Report, at xvii.

. See concurring in result op. at 921 (Par-iente, J.) (“[Tjhere is simply no precedent for this Court to engage in its own independent evaluation and reweighing of the facts and legislative policy findings, as done by the plurality, when conducting a rational basis analysis.”).

. Justice Lewis notes that medical malpractice filings have decreased significantly since fiscal year 2003-04 and that Florida, according to a 2011 report, is now retaining a fairly high percentage of Florida-trained medical students. See plurality op. at 913-14 (Lewis, J.). While he uses this information to support the plurality's argument that the statutory *932 caps are no longer justified because a medical malpractice crisis does not currently exist, this information just as easily (and perhaps more likely) supports the argument that the cap has had its intended effect and that, if the cap is eliminated, the medical malpractice crisis would return in full force.

. Of course, there is competent substantial evidence to support the Legislature's findings of fact. For example, one actuary testified before the Governor's Task Force that ”[m]ak-ing losses more predictable is a key to attracting companies to provide coverage, and it is also a key to getting more stable pricing in the marketplace.” And there was testimony that "[i]n Georgia, physicians pay from $5,000 to $6,000 for $1,000,000 of coverage. Thirty miles south, in Jacksonville, that costs $27,000.” Moreover, ”[i]n one instance, a Fort Lauderdale pediatric orthopedic surgeon's premiums went from $32,000 to $96,000 a year,” and, due to the increase, the surgeon planned to move to a state with tort reform.